608 So.2d 1149 (1992)
FLIGHT LINE, INC.
v.
Howard TANKSLEY and the Estate of Ann Tanksley, By and Through its Administrator, Howard Tanksley and National Union Fire Insurance Company.
No. 89-CA-0307.
Supreme Court of Mississippi.
July 29, 1992.
Rehearing Dismissed December 3, 1992.
*1152 Michael S. Allred, Stephen M. Maloney, Allred & Donaldson, Jackson, for appellant.
Paul Kelly Loyacono, Vicksburg, James F. Mixson, Shell Buford Bufkin Callicutt & Perry, Jackson, for appellees.
Before DAN M. LEE, P.J., and ROBERTSON and McRAE, JJ.
ROBERTSON, Justice, for the Court:

I.
Today's appeal and cross-appeal arise from a less than commonplace occurrence. A Vicksburg-based towing company chartered the aircraft of a commuter service to fly men and equipment to Chicago. During unloading, the craft suddenly sat down on its tail, shifting a heavy pump back onto *1153 Plaintiff, who was injured and sued the charter service in tort.
Thrice the Circuit Court has convened to try the case. Six days into the first such, the Court declared a mistrial. A two-week second trial saw a verdict for Plaintiff, but the Court ordered a substantial additur the Defendant refused. On the third trial on damages only, the jury returned a much larger verdict, and Defendant appeals.
The action has been hotly contested throughout. The issues by their nature, factual and otherwise, resist mightily our knowing the whole truth. We seek justice in the fairness of the process, accepting pragmatically its powers be limited.

II.

A.
Magnolia Marine Transportation Company is a Mississippi corporation operating out of Vicksburg. Magnolia Marine is in the river transportation business and is engaged primarily in moving cargoes of asphalt on the inland waterways system, principally the Mississippi River.
In October of 1984, Howard Tanksley, then thirty-five years of age, was employed by Magnolia Marine as a senior tankerman. Tanksley was the Plaintiff below and is Appellee/Cross-Appellant here. The tankerman's task is largely a manual labor job, requiring from time to time considerable physical strength. He is particularly responsible at the time of receiving and discharging cargo. Prior to October 8, 1984, Tankerman Tanksley was earning approximately $32,000.00 a year, plus fringe benefits. Magnolia Marine personnel say, had Tanksley not been injured, he likely would have been a career employee.
On October 8, 1984, Magnolia Marine's Vicksburg office received word two of its barges had become disabled in the Chicago area. Magnolia Marine determined to fly the needed personnel and equipment to Chicago and do the repair work itself. Flight Line, Inc., is a Mississippi corporation operating a commuter passenger and cargo air service out of the Jackson Municipal Airport in Rankin County, Mississippi. Flight Line was the Defendant below and is Appellant/Cross-Appellee here. Magnolia Marine's port captain, Gene Neal, called Flight Line to charter an airplane to transport two workers, their luggage, and the necessary equipment and tools from Vicksburg to Chicago. Capt. Neal requested an airplane adequate for a 1500 pound load. Flight Line, acting through its dispatcher, Cougar Easley, accepted the engagement and provided the aircraft, a Cessna 402B, and its pilot, Robert Avery. On land the craft rests and runs on three wheels, one under each armpit and a third under the nose, but no tail struts, a point whose import will presently appear.
Avery flew the aircraft to Vicksburg in Warren County and there supervised the loading of Magnolia Marine's equipment  three pumps and one motor  weighing in the aggregate some 1,079 pounds, together with a case of work tools weighing about 20 pounds. The two employees Magnolia Marine provided were Billy Chandler, an engineer, and Tankerman Tanksley. Chandler questioned pilot Avery about weight distribution in the plane and expressed concern of the possibility of the plane tipping over. Avery assured Chandler that the fuel and "stuff" in the wings would balance the plane. Under Avery's directions, the loading was completed.
The plane then took off from the Vicksburg Airport and flew to Chicago without incident. Upon arrival, Avery taxied to a terminal for light aircraft. Pilot Avery, together with Chandler and Tanksley, exited the plane and walked to the terminal where they met Frank Connor and other men who were to fly back to Mississippi. Avery mentioned filing flight plans for the return trip and told the men to arrange a truck  a full half-ton pickup truck  to be driven out to the plane to receive the equipment. The truck was backed up almost flush with the airplane door, its tailgate down. Chandler, Tanksley and Connor waited a while. Avery did not return, and they decided they had best get on with the unloading process.
Chandler and Tanksley re-entered the aircraft, Chandler to the front and Tanksley *1154 to the rear, while Connor was standing in the back of the truck. Chandler and Tanksley began to slide a heavy motor back and had moved it but a foot or so when the plane suddenly shifted rearward, its tail striking the ground and sitting there, its nose in the air at a 45 degree angle. When this happened, Tanksley was on the downside of the plane and was on the receiving end of the heavy motor, as Chandler could not hold it and finally let go.
Stunned for a few moments, Tanksley felt "pressure" in his back. Chandler and Tanksley then exited the plane to assess the situation. They waited ten or fifteen minutes. The pumps and motor had to be unloaded and were unlikely to unload themselves. Chandler and Tanksley proceeded anew, and with Connor's assistance, managed to push and shove the several pieces of heavy equipment into the truck. When they unloaded the last piece, a 382 pound pump, the plane righted itself just as suddenly.
Soon thereafter, Tanksley's back began to bother him, a matter verbally reported to port captain Neal either that night or the next day through a phone call. There is evidence Tanksley took medicine for pain that evening. Eight days later, Tanksley, who is illiterate, had his wife, Ann, complete a written accident report which was delivered to Magnolia Marine in Vicksburg on November 16. In that report, Ann Tanksley said Howard had slipped on oil in the back of the pickup truck. All eyewitnesses agree there was no oil in the back of the truck nor did Tanksley slip there, and, in view of the verdict, we regard this an inadvertence of no consequence.
Tanksley was treated by Dr. George Abraham of Vicksburg. Dr. Abraham first found no evidence of a pinched nerve in Tanksley's back and after a period of hospitalization and conservative treatment, released Tanksley to return to light work. Ten days later, Tanksley returned to Dr. Abraham reporting he had re-injured his back lifting a heavy object. Dr. Abraham then referred Tanksley to Dr. Lynn Stringer, a neurosurgeon, who operated on Tanksley for a herniated disk in 1984. After a period of convalescence, Dr. Stringer released Tanksley for light work but readmitted him to the hospital in July of 1985 with renewed back pains. Dr. Stringer performed a second disk operation and subsequently, Dr. Daniel Dare, an orthopedic surgeon, performed a third.

B.
On September 6, 1985, Howard Tanksley commenced the present civil action by filing his complaint against Flight Line, Inc., claiming personal injuries said to have been proximately caused by the negligent arrangement and stowage of the cargo of heavy equipment prior to the flight to Chicago and thereafter by the failure to supervise the unloading of same in Chicago. Ann Tanksley, Howard's wife, joined as a plaintiff with a claim of loss of consortium. Ann Tanksley was killed in an accident on April 21, 1987, and her action was revived in the name of Howard Tanksley, administrator of her estate. National Union Fire Insurance Company, Magnolia Marine's workers' compensation insurance carrier, intervened as a plaintiff by reason of the compensation and medical benefits it had paid Tanksley.
Flight Line denied the essential allegation of the complaint and immediately challenged venue in Warren County. Flight Line's motion to transfer was denied. The Circuit Court first called the case for trial on July 27, 1987, but this accomplished little as matters ended in a mistrial. Eleven months later, the case was tried anew, and the jury returned a verdict for Tanksley in the amount of $100,000.00. Tanksley moved for an additur or, in the alternative, for a new trial on damages, and the Circuit Court granted the motion, ordering an additur of $400,000.00 and failing that, a new trial on damages only. Flight Line rejected the additur.
On January 23, 1989, the Circuit Court of Warren County convened a jury for a third time, this time to hear the issue of damages only. In response to interrogatories, the jury found Tanksley's total damages to be $4,120,400.00, but found further that *1155 Tanksley had knowingly entered a position of open and apparent danger and that this was thirty percent of the total negligence in the case and, further, the jury found twenty-five percent of Tanksley's damages were the proximate result of his failure to take care of himself, post-accident and ultimately post-surgery, a failure to mitigate his damages, if you will. The jury's net verdict was $1,854.180.00. The Circuit Court entered judgment in favor of Tanksley and against Flight Line in this amount. Meanwhile, the Circuit Court dismissed the claim for Ann Tanksley's loss of consortium.
Flight Line moved for judgment notwithstanding the verdict, or, in the alternative, for a trial or, in the alternative, for a new trial on damages only or a remittitur. The Circuit Court denied all motions. Flight Line now appeals, and Tanksley cross-appeals.

III.
Our first issue is venue. Flight Line complains that it was required to submit to trial in Warren County. Flight Line is a domestic corporation with its principal place of business in Rankin County and, as the record reflects, timely objected to venue in Warren County and moved for a transfer to Rankin County. Flight Line pressed the point several times over but to no avail.
Venue is a function of statute. Miss. Code Ann. § 11-11-3 (1991) has at all times relevant hereto provided:
Civil actions of which the circuit court has original jurisdiction shall be commenced ..., if the defendant is a domestic corporation, in the county in which said corporation is domiciled or in the county where the cause of action may occur or accrue... .
Applied here, venue lay in one of "two" places, Rankin County, the county of Flight Line's domicile,[1] or the county "where the cause of action may occur or accrue." Flight Line says the cause of action occurred or accrued in Chicago, hence venue in Mississippi was proper only in Rankin County.
In venue disputes courts begin with the well-pleaded allegations of the complaint. These, of course, may be supplemented  and contested  by affidavits or other evidence in cognizable form. See Long v. Patterson, 198 Miss. 554, 562-64, 22 So.2d 490, 492-93 (1945). What is important is that venue needs to be settled early on. See New Biloxi Hospital, Inc. v. Frazier, 245 Miss. 185, 192, 146 So.2d 882, 885 (1962). This policy premise undergirds our rule that a defendant waives any objection to venue unless he asserts it early on. Rule 12(h)(1), Miss.R.Civ.P.; Atwood v. Hicks, 538 So.2d 404, 407 (Miss. 1989). If venue is proper when and where suit is filed, it may not be ousted by later events. See Blackledge v. Scott, 530 So.2d 1363, 1365 (Miss. 1988).
Of right, the plaintiff selects among the permissible venues, and his choice must be sustained[2] unless in the end there is no credible evidence supporting the factual basis for the claim of venue. See Mississippi Power Co. v. Luter, 336 So.2d 753, 754 (Miss. 1976); Great Southern Box Co. of Miss. v. Barrett, 231 Miss. 101, 109-110, 94 So.2d 912, 914-15 (1957). Put otherwise, the court at trial must give the plaintiff the benefit of the reasonable doubt, and we do so on appeal as well. Still, we regard venue a right as valuable to the defendant as to the plaintiff. Jefferson v. Magee, 205 So.2d 281, 283 (Miss. 1967). If in the end venue is improper, the court must honor timely objection and transfer to the correct venue, and, if it does not do so, we must reverse. Dunn v. *1156 Dunn, 577 So.2d 378, 379-80 (Miss. 1991); Board of Trustees of State Institutions of Higher Learning v. Van Slyke, 510 So.2d 490, 493 (Miss. 1987); Batson & Hatten Lumber Co. v. McDowell, 159 Miss. 322, 131 So. 880 (1931).
Tanksley argues, as he has throughout, that the cause of action at least partially occurred in Warren County.[3] The Circuit Court accepted this view and, en route to denying Flight Line's motion, said:
I think where an accident results as a result of a series of acts, the fact that it finally culminates in a foreign place does not take it away from where it began to start.
Flight Line tells us all of this is error and that where a cause of action occurs within the meaning of Section 11-11-3, is, in effect, the place where the last event occurs or, more generally, where the injury is, in fact, inflicted. It appears we have adopted this view a while back in Masonite Corp. v. Burnham, 164 Miss. 840, 146 So. 292 (1933). In construing the words "occur or accrue" within the statute, Masonite reasoned, although the cause of the injury may have had, and did have, its origin in one county, the cause was entirely harmless, and on account of which no action could accrue, until the injury took place, and when that injury occurred in another county the cause of action, within the meaning of the venue statute occurred or accrued in the latter county. Masonite, 164 Miss. at 851-52, 146 So. at 293-94.
This reasoning seems flawed. In the first place, "occur" and "accrue" are not synonymous, legally or otherwise, as the disjunctive connector forthrightly suggests. We read accrual in its formalistic sense. A cause of action accrues when it comes into existence as an enforceable claim, that is, when the right to sue becomes vested. Forman v. Mississippi Publishers Corp., 195 Miss. 90, 104, 14 So.2d 344, 346 (1943). This may well mean the moment injury is inflicted, that point in space and time when the last legally significant fact is found. "Occur" is a less formalistic term. It is event oriented to its core. It connotes conduct and phenomena and imports no preference among all of those necessary that a plaintiff may sue. It is certainly true in cases such as this the action  the improper loading in Vicksburg  was harmless when done "and on account of which no action could accrue, until the injury took place." What Masonite misses is that the converse is equally true. The injury could not, as a matter of common sense, take place had it not been for the conduct in the county of origin. The mere fact of injury in Chicago could not be actionable without negligence somewhere, here (at least in part) in Warren County.
Flight Line argues we reaffirmed Masonite in Coca-Cola Bottling Co. v. Cox, 174 Miss. 790, 165 So. 814 (1936). In Coahoma County, Coca-Cola bottled within its soft drinks decomposed bodies of roaches. The plaintiff received the Coke and drank it in Tunica County and suffered injury. The court held venue proper in Tunica County where the injury occurred when the plaintiff drank the coke. This decision, of course, is entirely proper. The words "occur or accrue" within the statute are at least broad enough to include the place where the injury is inflicted, but this does not and cannot exclude the place where substantial parts of the injury-causing conduct occurred, in that case in Coahoma County.
Blackledge v. Scott, 530 So.2d 1363 (Miss. 1988), is the other side of the coin. *1157 Plaintiff, a resident of Claiborne County, boarded an automobile in Claiborne County and was injured later in Hinds County. We rejected his claim of venue in Claiborne County. The reason this is correct is that nothing happened in Claiborne County which in law had any causative effect upon the claim plaintiff asserted. Blackledge is quite sharply distinguished from the case at bar. Had Tanksley without more boarded the plane in Warren County for the flight to Chicago, Blackledge would control. What takes this case out of Blackledge is that Tanksley has alleged and presented colorable proofs that in Vicksburg and in Warren County, Flight Line delivered a plane not suited for the task at hand and/or loaded the aircraft overweight and out of balance.
In the final analysis, venue is about convenience. The legislative prescription implies a legislative finding counties meeting certain criteria will generally be more convenient to the parties. The use of "occur" makes sense because important witnesses will often be accessible where the action occurs. Yet, there is nothing in the phrase "where the cause of action may occur... ." that limits the judicial search for but a single county. Torts arise from breaches of duties causing injuries, and it is common experience that breach and causation and impact do not all always happen at once.[4] At the very least, the word "occur" connotes each county in which a substantial component of the claim takes place, and this may include, in the present context, the negligent conduct which substantially undergirds Tanksley's claim. Anything to the contrary in Masonite Corp. v. Burnham or following cases stands overruled.
The Circuit Court did not err when it denied Flight Line's motion for a change of venue. That the emphasis at trial centered on the unloading in Chicago does not counsel the contrary. From the outset and at trial, Tanksley alleged and colorably proved part of Flight Line's negligence occurred in Warren County.

IV.
Flight Line challenges the correctness and adequacy of the instructions given the jury on the liability issues. With one possible exception, the attack centers on the generality of language. Flight Line says the instructions did not adequately channel the jury's attention toward the specifics of the Tanksley charge of negligence.
It is old hat that we read jury instructions as a whole. Imperfections in particular instructions do not require reversal where all seen together fairly announce the primary rules applicable to the case. See, e.g., Purina Mills, Inc. v. Moak, 575 So.2d 993, 996 (Miss. 1990); Payne v. Rain Forest Nurseries, Inc., 540 So.2d 35, 40 (Miss. 1989). In today's context we ask only that the instructions, read collectively, fairly inform the jury "on the elements necessary to establish liability." Strickland v. Rossini, 589 So.2d 1268, 1275 (Miss. 1991).
Flight Line complains of three specific instructions. First, there is Instruction No. P-25, which is a general vicarious or imputed liability instruction, telling the jury that, if it should find pilot Avery or *1158 dispatcher Easley negligent, their negligence is imputed to Flight Line.[5] Said-to-be-erroneous Instruction No. P-33 instructed the jury that pilot Avery had a duty to attend the unloading process in Chicago and "to reasonably protect his passengers from the dangers of unloading this aircraft."[6] Instruction No. P-34 is related to P-33. It tells the jury that, if it found that Chandler, Tanksley and Connor "were going to unload the aircraft as soon as possible," this afforded a special circumstance for judging pilot Avery's failure to be present or in any other way take part in the unloading of the aircraft.[7]
This was not all the jury was told regarding negligence. Instruction No. C-1 provided a boilerplate definition of negligence.[8] Instruction No. D-38 told the jury of foreseeability in the law of negligence, focusing the jury's attention on whether, back in Mississippi and before unloading in Chicago, Flight Line's employees should reasonably have foreseen harm likely to occur as result of their failure to exercise reasonable care.[9] Instruction No. D-43 isolated the jury's attention on the loading and unloading of the aircraft and told the jury this should be its focus and not the "training, skill and expertise of the pilot."[10] Jury Instruction Nos. D-7 and D-41 *1159 carefully explained causation in tort and told the jury it could not find for Tanksley, unless Flight Line's negligence was a proximate cause of Tanksley's damages. Instruction No. D-8 meticulously explained Tanksley's preponderance-of-the-evidence burden of proof regarding his negligence claim.
Against this backdrop, Flight Line points to the three instructions first noted and reminds us we have said from time to time instructions regarding negligence are inadequate where "there is no indication in what manner the defendant was negligent." Rucker v. Hopkins, 499 So.2d 766, 772 (Miss. 1986); see also, Critelli v. Blair, 203 So.2d 604, 607-608 (Miss. 1967). We are reminded as well we have said such abstract instructions may be saved only if other instructions correctly define negligence. Trainer v. Gibson, 360 So.2d 1226, 1228 (Miss. 1978). In a sense all of this but begs the question, was the jury fairly and adequately instructed regarding Tanksley's claim of negligence against Flight Line? It is no answer that the instructions could have been made more specific. We consider whether the instructions as they were fairly constricted and guided the jury's deliberations. We think the answer in the affirmative.
These jury instructions did not leave the jury with only a free-floating definition of negligence. This is not a case where "the jury was left to grope with, and surmise, what the negligence referred to consisted of." Rucker, 499 So.2d at 772. Instruction No. P-33 directed the jury's attention to pilot Avery and what he reasonably should have done to see to the safety of his passengers incident to the unloading of the aircraft in Chicago. The instruction particularly told the jury to assess the dangers of this unloading (remember D-38 on foreseeability) and whether pilot Avery did (or omitted to do) something (he should have done) in connection therewith. Instruction No. P-34 addressed the special circumstance that time may well have been of the essence for Magnolia Marine's employees, Chandler and Tanksley, a matter all understood against the backdrop of the general evidence that Magnolia Marine's reason for hiring Flight Line to fly the men and equipment to Chicago was that it needed to attend to the disabled barges with some dispatch. Instruction No. D-43 directed the jury's attention to "the pilot's operation of the aircraft, loading and other actions." Beyond this, at least four instructions  P-26, D-51, D-52 and D-53  addressed the charge that Tanksley was negligent and concentrated on the unloading process.
So seen, these instructions do point to loading and unloading as the areas in which Flight Line is charged with negligence. Collectively they rivet the reader's attention on the loading and unloading, and the particulars thereof, and provoke thought of who in that setting acted with reasonable care and who did not. By way of illustration, compare a garden variety automobile accident lawsuit. It may be we would have problems if the jury were only given a general definition of negligence. Critelli v. Blair, 203 So.2d at 607-608. But we doubt anyone would think things amiss if the instructions failed to particularize in what detail the defendant driver failed to drive at a rate of speed reasonable under the circumstances, failed to keep his automobile under reasonable and proper control, failed to keep proper lookout ahead, and the like. In this sense, the instructions here challenged are no more inadequate than those we approve routinely across a range of negligence cases.
Flight Line complains further that these instructions have the jury finding duties "even though this is without doubt a question of law for the court." (Brief of Appellant, p. 15) It is true that Instruction No. P-34 asks the jury to find whether pilot Avery "had a duty to supervise the unloading *1160 of the aircraft." But this is consistent with our general law. The duty to exercise reasonable care is imposed by the positive law. The question is how best we may identify the content of that duty. Instruction No. P-34 asks the jury to help in that identification process. It asks the jury whether in the exercise of reasonable care under the circumstances, Pilot Avery ought have supervised the unloading.
Because we are concerned with an endeavor not familiar to ordinary jurors, it was appropriate that expert witnesses flesh out what reasonably should have been expected of those professional and competent in the field and, indeed, plaintiff provided Richard Tucker and Joseph N. Clesi, two aviation experts in this and other settings. See, e.g., Wirtz v. Switzer, 586 So.2d 775, 780-81 (Miss. 1991); Ladner v. Campbell, 515 So.2d 882, 887-888 (Miss. 1987); Marshall v. The Clinic for Women, P.A., 490 So.2d 861, 864-65 (Miss. 1986); Dean v. Conn, 419 So.2d 148, 150-51 (Miss. 1982). We tell our juries it is their duty to decide upon the credibility of such experts and their testimony regarding the specific content of a litigant's duty. If this be submission to the jury of the existence vel non of a duty, so be it. See Lowery v. Guaranty Bank and Trust Co., 592 So.2d 79, 84 (Miss. 1991). That courts have ultimate authority to declare duties, and review jury findings, see George B. Gilmore Company v. Garrett, 582 So.2d 387, 394-95 (Miss. 1991), does not preclude our getting what help we can from experts, from participants in customs, and from juries.
Finally, we need note that Instruction No. P-25 refers to pilot Avery and dispatcher Easley. Flight Line says this instruction is fatally flawed, at least with respect to Easley in that no other instruction mentions Easley nor gives any particulars regarding his negligence.
Context is important. First, Instruction P-25 is a vicarious or imputed liability instruction. It tells the jury Flight Line is responsible if the jury "should ... find ..." that either Avery or Easley was negligent. The factual context, of course, was Tanksley's original allegations and early efforts to show that Easley had dispatched to Vicksburg a plane which he knew or reasonably should have known was inadequate to the task. As the case developed and was submitted to the jury, however, this issue fell by the wayside for all practical purposes. Without question, the jury's focus at trial was upon the loading of the aircraft in Vicksburg, and the weight distribution there, and, more particularly, upon the unloading in Chicago. In the absence of substantial evidence and argument regarding dispatcher Easley and the fact that the instruction is a subjunctive "if" instruction, and while conceding matters might have been better had Easley's name been deleted, there is nothing here requiring reversal.
We think it not unfair to add the vicarious liability instruction the Court gave at Flight Line's request contains the same would-be vice. Instruction No. D-39 talks of "Bob Avery or the other employees of Flight Line, Inc." D-39 affords the jury no guidance in assessing the conduct of these "other employees," presumably including Easley.

V.
Flight Line complains of the Circuit Court's additur order following the first completed trial. The jury on that occasion had returned a general verdict for Tanksley in the sum of $100,000.00. Tanksley saw the verdict woefully inadequate and so moved the Court which, on August 15, 1988, ordered an additur of $400,000.00 or, should Flight Line say "No," a new trial on damages only. Miss. Code Ann. § 11-1-55 (Supp. 1991). Flight Line rejected the additur. Flight Line now argues the Circuit Court erred in ever ordering it.
We deal with a species of the motion for a new trial. The trial court is required to view the evidence on damages in a light reasonably favorable to the defendant, the same as in any other motion for a new trial. The Court has no authority to vacate a damage award merely because it thinks the jury erred or because, if the Court had been the finder of the fact, it would have awarded a greater or lesser *1161 sum. Odom By And Through Odom v. Parker, 547 So.2d 1155, 1157 (Miss. 1989); State Highway Commission of Mississippi v. Hayes, 541 So.2d 1023, 1025 (Miss. 1989); Holmes County Bank & Trust Co. v. Staple Cotton Co-op. Ass'n, 495 So.2d 447, 451 (Miss. 1986). The Circuit Court has no authority to order an additur absent circumstances where the verdict is so contrary to the weight of the evidence or so inadequate, by reference to the law and the facts, that it may not be reasonably explained. See Miss. Code Ann. § 11-1-55 (Supp. 1991); Toyota Motor Co., Ltd. v. Sanford, 375 So.2d 1036, 1037-38 (Miss. 1979); Walton v. Scott, 365 So.2d 630, 632 (Miss. 1978); Standard Products, Inc. v. Patterson, 317 So.2d 376, 379 (Miss. 1975).
On appeal, our scope of review is as in new trial jurisprudence generally. This Court should reverse the action of the trial court only where convinced that trial court has substantially abused its discretion. James v. Jackson, 514 So.2d 1224, 1227 (Miss. 1987); Biloxi Electric Co., Inc. v. Thorn, 264 So.2d 404 (Miss. 1972). We see the facts as does the trial court  in a light reasonably favorable to the defendant, as in new trial jurisprudence generally. Here that means the evidence at Tanksley's first full trial, not the later new trial on damages only.
Turning to the facts, we know Howard Tanksley was thirty-five years old at the time of his injury and that he had been steadily employed for many years with Magnolia Marine and was earning approximately $32,000.00 a year, plus participation in a rather generous fringe benefits program. Perhaps due in part to his illiteracy and lack of education, we know that Tanksley is permanently occupationally disabled. At the time of his injury, Tanksley had a work life expectancy of 24.3 additional years. If we assume his wages remained the same, simple arithmetic shows lost wages approaching a million dollars. Reasonably projectable increases in earnings, with all discounted to present value, do not appreciably alter this. We have before us as well uncontradicted evidence of lost fringe benefits, which the Circuit Court put at "in excess of $150,000.00." We know that at the time Tanksley had medical bills of some $28,000.00. The Court found calculable lost wages, fringe benefits and past medical expenses approached $1,178,000.00. In this view, the Circuit Court held the $100,000.00 verdict grossly inadequate "without any figures for pain and suffering or future medical."
The Circuit Court has commendably afforded us a reasoned elaboration of its decision. Six factors are articulated, several of which Flight Line attacks with vigor. The Court worried it had not told the jury Tanksley would have to repay Magnolia Marine's workers' compensation insurance carrier some $90,000.00, plus or minus. Indeed, it had not, though National Union Fire Insurance Company had intervened with its subrogation claim. Flight Line takes offense to this reference and, no doubt, is technically correct in that the Court may not order an additur based on a fact not in evidence, i.e., the obligatory workers' compensation repayment. City of Jackson v. Lee, 234 Miss. 502, 106 So.2d 892, 895 (1958). How much Tanksley would have to repay National Union bears no legal relevance to how much Tanksley should recover from Flight Line. Notwithstanding, we are struck that all of this gives further documentation of Tanksley's medical expenses to date and two-thirds of his average weekly wage to date approaching $90,000.00 and in essence corroborating the damages found on other grounds.
We are directed to Toyota Motor Co., Ltd. v. Sanford, 375 So.2d at 1037, where in reversing an additur we commented the lower court had acted "largely, if not entirely, upon the testimony of an `expert economist.'" The citation is not inapt but it does not carry us far. The question is whether the trial court gave impermissible weight to the economist's testimony. In Toyota the trial court did just that. In the case at bar, the Circuit Court had before it the testimony of economist Homer Gardner. Dr. Gardner's opinion testimony in the present context was quite potent to the point that Tanksley's damages had to be more than $100,000.00.
*1162 Flight Line argues strenuously it is inappropriate merely to compare proven damages with the verdict, implying this is what the Court did. In point of fact, the Circuit Court submitted the issue of comparative negligence to the jury. See Instruction No. D-23. It reasoned the jury's verdict necessarily meant it had accepted "one or more of the affirmative defenses offered, i.e., contributory negligence."
Evidence of the plaintiff's own negligence may operate to reduce the plaintiff's damages. Indeed, we have a number of cases where we have sensitively assessed a plaintiff's own negligence when he makes the charge that the jury's damage award is grossly insufficient. See, e.g., Hill v. Dunaway, 487 So.2d 807 (Miss. 1986); Akin v. Cowie, 405 So.2d 903, 907 (Miss. 1981); Comer v. Gregory, 365 So.2d 1212, 1215 (Miss. 1978); Screws v. Parker, 365 So.2d 633, 636 (Miss. 1978); Carr v. Cox, 255 So.2d 317 (Miss. 1971); Hynum v. Smith, 447 So.2d 1288, 1290 (Miss. 1984). The cases cited do state the principle claimed, which but begs the question, how much legally cognizable damage has a given plaintiff suffered and how great has been his share of the negligence? The fact that in some cases plaintiff's damages were low and his negligence high, leaving undisturbable a verdict below special damages, proves little in cases where the facts are different. In today's case the facts are different.
Still, Flight Line attacks at many points. It insists it is entitled to the inference that Tanksley (further) injured himself on the day in question when he slipped on oil in the back of the truck. Flight Line relies on the report Tanksley's wife filled out eight days after the fact. We think the Circuit Court was within its prerogative in discrediting this report. All three eyewitnesses denied any such oil in the truck. There simply was no credible evidence before the Court that Tanksley slipped on oil in the truck bed, and the Circuit Court was generous to Flight Line in submitting the issue to the jury at all. See Instruction No. D-32.
Flight Line's principal charge is that Tanksley was guilty of so much negligence contributing to his own injury that the $100,000.00 verdict was not at all out of line. We are told after the plane first tilted and the pump fell on Tanksley, he continued to work and assisted in unloading the other equipment and, when the plane righted itself, he was injured once more. We would have thought Tanksley's conduct reasonable, if not commendable. He was not free to walk away after the plane first tilted. See Daves v. Reed, 222 So.2d 411, 415 (Miss. 1969). His employer had sent him to Chicago with a job to do, an important job to do and one that need be done with dispatch. It was apparent pilot Avery was going to be of little help. More important, at the time the plane tilted and Tanksley caught the weight of the pump and felt some "pressure" in his back, he was by no means chargeable with knowing how serious his injury or how best he should avoid aggravation. Even so, the Circuit Court accepted that there was "some degree of proof of contributory negligence" and in this the Court was proper, but this hardly scales down to $100,000.00 a seven figure pecuniary loss and that before a penny is added for pain and suffering, mental or emotional distress, permanent functional impairment or loss of enjoyment of life.
There is a further dimension. Substantial evidence reflects Tanksley did not follow doctor's orders and likely worsened his injuries as result. On November 4, 1984, he ignored instructions and reinjured himself, and it is true this led to his first surgery. Following this first surgery, Tanksley did indeed lie about a pinprick test because he was bored at home and thought he should return to work and, as a result, Dr. Stringer released him to go back to work to "light duty" sooner than he otherwise would have. After the surgery, he worked difficult, strenuous shifts and further aggravated his condition.
Without question, a person injured in tort is required to take reasonable steps to mitigate his damages, and this, at the very least, includes giving attention to doctor's *1163 orders regarding his course of recovery. See Reikes v. Martin, 471 So.2d 385, 389 (Miss. 1985); Pelican Trucking Co. v. Rossetti, 251 Miss. 37, 167 So.2d 924, 927 (1964); Yazoo & M.V.R. Co. v. Fields, 188 Miss. 725, 195 So. 489, 490 (1940); Buras v. Shell Oil Co., 666 F. Supp. 919, 924 (S.D.Miss. 1987). In the relevant posture of the case, the Circuit Court was no doubt obliged to accept that Tanksley had failed in this duty, that he had in fact aggravated his condition by his own course of conduct. Nevertheless, when we consider in the aggregate Tanksley's calculable economic losses, coupled with pain and suffering, mental or emotional distress, loss of enjoyment of life, permanent total disability, even when discounted significantly for Tanksley's comparative negligence and failure to mitigate his damages, the $100,000.00 verdict is so contrary to the weight of the evidence and so grossly inadequate by reference to the law and the facts that it may not reasonably be explained.
The Circuit Court was well within its authority when it ordered an additur. Of course, the fixing of the amount of an additur is of necessity arbitrary in substantial part. The court should shoot for the lowest dollar figure that would have survived a motion for an additur. This is the smallest damage award, had the jury returned it, we would hold within reason and the evidence. We cannot say on this record the Circuit Court erred when it fixed the additur at $400,000.00.

VI.
Flight Line argues that at the second damages-only trial, Tanksley failed to prove causal connection between its negligence and his damages. It pressed the point at trial and argues here that the Circuit Court erred in denying his motion for judgment notwithstanding the verdict following the second trial.
The issue calls for a consideration of the meaning and effect of two words in our additur statute. Miss. Code Ann. § 11-1-55 (1972)[11] authorizes our trial courts to order an additur on certain conditions. The statute goes further to empower the court, should the additur not be accepted, to order a new trial on "damages only." This is what the Circuit Court did in the case before us. Because Flight Line refused the $400,000.00 additur, the Circuit Court ordered a new trial on "damages only." Flight Line's present assignment charges that we say what is meant by these two words.
Flight Line concedes its negligence is taken as established. It insists, however, that all issues going to the quantum of damages are before the Court. Without question, all of this includes the nature and extent of Tanksley's medical expenses, loss of wages, pain and suffering, mental anguish, permanent disability and the like. It includes as well evidence of Tanksley's contributing negligence and his failures to mitigate his damages, as noted above. The question, however, is whether Tanksley is required to establish causal connection between Flight Line's negligence and his damages as fully as before. It arises in the context of a record where it is quite apparent Tanksley did not perceive he needed to (re)prove causation. At his second trial, he called only Dr. Daniel Dare, orthopedic surgeon, who first saw him in April, 1986, more than a year and a half after the original injury. Dr. Dare performed the last of Tanksley's back operations and made no significant effort to relate *1164 what he found causally to the October, 1984, occurrence in Chicago.
In a certain sense, Flight Line is right. A damages-only new trial should not afford a plaintiff license to prove all of the ills of his life and send the defendant the bill. For example, we would not on such a trial permit a plaintiff to offer proof that, two years after the fact, he fell from a tree and broke his arm and leg  injuries unrelated in any sense to the tortiously-caused injury. On the other hand, the procedure we accept provides for a new trial on "damages only," and we see no reason not to take these words seriously. The issues of negligence and causation were decided in the first trial and are not open to re-litigation.
We accommodate these premises with Flight Line's practical concern through our regular rules of evidence. The reason injuries from falling from a tree would not be provable is that proof of such lacks relevance to the issues before the Court. At a new trial on damages only, it is incumbent upon the plaintiff to stick with the damages arising from his tortiously inflicted injury. It is incumbent upon the defendant, if he thinks the plaintiff is going afield, to object on grounds of relevancy. Rules 401 and 402, Miss.R.Ev. This affords the defendant all of the practical protection he needs, while avoiding any retrial of issues already decided.
We find no such objections in the case at bar. The point is not raised until Tanksley had rested and Flight Line moved for a directed verdict. In a very real sense, Flight Line's point is not so much that Tanksley went afield in proving damages, but that he did not connect the damages he proved as he had in the first full trial. But this is precisely the point. Tanksley had made the requisite connecting proof before, Flight Line fighting and contesting all the way. The statute does not contemplate that he rerun the gauntlet. We decline to reverse on this issue.

VI.
Flight Line charges the Circuit Court erred when it admitted over his objection the testimony of Dr. Homer Gardner, an economist associated with the U.S. Corps of Engineers. Plaintiff Tanksley tendered Gardner as an expert witness in the fields of economics and economic analysis as it relates to lost income and "whatever else that entails." Flight Line does not object so much to Gardner's credentials or standing as an expert in the tendered field; rather, it is the substance of Gardner's opinion that is found offensive.
Assessing fairly the future economic losses of one who has been injured has long concerned us. We take it a given there should be but one trial (or, as here, as few more than one as possible) and this trial should be held as soon after suit as is reasonably practicable. In cases such as this, there is a virtual certainty the plaintiff will suffer future economic losses. Yet, in order to project those, we must see into the future, and we must do this consistent with our rule that, to be recoverable, damages must be shown with reasonable certainty and not left to speculation and conjecture. Strickland v. Rossini, 589 So.2d 1268, 1275 (Miss. 1991); Hudson v. Farrish Gravel Co., 279 So.2d 630, 635-36 (Miss. 1973).
A generation ago perceptive counsel began to see the desirability of presenting expert witnesses in the fields of economics and economic analysis to present a hopefully reasoned projection of future economic losses. Our initial encounters with such expert testimony was a healthy measure of skepticism. Mississippi Power & Light Co. v. Shepard, 285 So.2d 725 (Miss. 1973). Such witnesses have now become a regular part of the legal landscape in serious personal injury and wrongful death actions. See, e.g., Jones v. Shaffer, 573 So.2d 740, 742 (Miss. 1990); Turner v. Turner, 524 So.2d 942, 943 (Miss. 1988); Jesco, Inc. v. Shannon, 451 So.2d 694, 699, 703 (Miss. 1984); Seaboard Systems Railroad, Inc. v. Cantrell, 520 So.2d 479, 480, 484-87 (Miss. 1987). That this is so hardly suggests the controversy or the problems regarding such testimony have been removed.
The admissibility of such opinion testimony today is subject to our rules of evidence. Our increasingly familiar general standard is that a witness qualified in a given field *1165 may give expert opinion testimony that "will assist the trier of fact to understand the evidence or to determine a fact in issue."[12] Rule 702, Miss.R.Ev. Historically, the factual predicate for an expert's opinion had to be laid in the proof. Today's rules have bowed to practical reality, recognizing that all experts customarily and necessarily rely on matters which cannot feasibly be placed in evidence. The core idea of our modern law of evidence is that courts should be no more picky than the people generally, and we should admit and credit what reasonably prudent people rely on in the important decisions of their lives. Here we know that professionals and experts in various disciplines commonly rely on matters which may not withstand scrutiny under technical in-court rules of evidence. And so we provide that qualified experts may base their opinions in part on facts or data not in evidence but "of a type reasonably relied upon by experts in the particular field ..." Rule 703, Miss. R.Ev.[13]
Our standards before us, we come to Dr. Gardner and his opinion that the present value of Tanksley's lost income was $1,112,453.00. Flight Line attacks four of the opinion's factual predicates. Regarding Tanksley's wages, the record reflects that he earned $30,300.00 in 1980, $28,700.00 in 1981, $30,600.00 in 1982, $30,200.00 in 1983, and $31,200.00 in 1984. Dr. Gardner opined that for the future Tanksley's annual earnings could be reasonably expected to increase at a rate of 1.4 percent per year, exclusive of inflation. Flight Line cites Tanksley's earning history points to the fact that the fifteen year inflation rate was 6.7 percent, which would mean, according to Dr. Gardner's projection, an expected salary increase at the rate of 9.1 percent per year. Flight Line relies heavily on the fact that over the last five years Tanksley's wages increased at only 3 percent per annum. As a matter of common sense, past earnings do not fix future earnings, though they are relevant. Many factors influence a future earnings projection in addition to actual earnings for a period immediately preceding. In any event, Flight Line's attack goes to the weight or credibility of Dr. Gardner's opinion, not its admissibility.
Dr. Gardner proceeded on the assumption Tanksley was totally occupationally disabled. Flight Line scoffs at this and points to the testimony of Dr. Daniel Dare as meaning only that Tanksley would be disabled from a "job requiring usual manual labor," and further to the opinion of Dr. Lynn Stringer that Tanksley had only a 20 percent functional impairment of the body as a whole. Flight Line ignores that Tanksley is illiterate and uneducated, by reason of which he had no economic opportunities beyond manual labor. Magnolia Marine's port captain, Gene Neal, said he would like to have given Tanksley "a desk job," but his lack of education made that impracticable. In any event, as a predicate to an expert testimony, it is not required that the predicate fact be proved beyond a reasonable doubt, only that it be available in some colorable form.
Flight Line complains as well that Dr. Gardner factored into his opinion fringe benefits at 31.7 percent of Tanksley's earnings. We are told this information was received by Dr. Gardner through a hearsay telephone conversation with a representative of Magnolia Marine's parent organization, who said fringe benefits were about 30 percent and competitive with the nation as a whole. Flight Line ignores that Dr. Gardner's principal reference was the U.S. Department of Commerce's Statistical *1166 Abstract for industries such as Magnolia Marine which projected fringe benefits at 31.317 percent of earnings.
It is true Dr. Gardner testified at the first trial Tanksley was entitled to fringe benefits at eleven percent of earnings. On this occasion, he had included only social security, hospitalization insurance, and retirement benefits. Dr. Gardner explained that he had since learned this figure unrealistically low as these were the only benefits an employer was legally required to pay, as distinguished from what was actually being provided. Again, all of this was fine fodder for cross-examination, but that only.
Fourth, Flight Line complains Dr. Gardner was allowed to include in his computation of future economic losses $6,000.00 per year for the value of a motor vehicle. The record reflects that Magnolia Marine had provided Tanksley with the use of a vehicle and reasonably could have been expected to continue so in the future, had it not been for his injury and ultimate termination from employment. Dr. Gardner testified that the $6,000.00 figure was furnished by Tanksley's counsel, but he had relied primarily on the fact that it was known to him personally and through common knowledge that this was a reasonable annual value of this benefit. Dr. Gardner insisted he knew the replacement cost of the truck Tanksley's counsel had given him was consistent with his everyday knowledge of vehicle prices.
In sum, we reiterate that the issue is one of admissibility. We accept that the U.S. Department of Commerce's Statistical Abstract is the sort of data customarily relied upon by economists in forming opinions. We find as well that there was in the record a colorable factual predicate upon which Dr. Gardner might base his opinion. Expert opinions, of course, are not obligatory or binding on triers of fact but are advisory in nature. The jury may credit them or not as they appear entitled, weighing and judging the expert's opinion in the context of all of the evidence in the case and "the jury's own general knowledge of affairs ..." Schoppe v. Applied Chemicals Division, 418 So.2d 833, 837 (Miss. 1982). All of this may be said as well of opinions of economists such as that here at issue. Dickey v. Parham, 295 So.2d 284, 286 (Miss. 1974).
We find no error in the admission of Dr. Gardner's testimony.

VII.
At the time of Howard Tanksley's accident on October 8, 1984, Howard and Ann Tanksley were husband and wife living in Vicksburg. When Howard filed his original suit for personal injuries, Ann joined a claim for loss of consortium. See Rule 20(a), Miss.R.Civ.P. Following Ann's untimely death in an automobile accident on April 21, 1987, the Chancery Court of Warren County appointed Howard administrator of her estate, and in his official capacity and as her personal representative, Howard has continued to press Ann's claim. See Rule 25(a), Miss.R.Civ.P. At trial the Circuit Court directed a verdict for Flight Line. See Instruction No. D-20. The Court acted on the premise that Ann Tanksley had died and that Ann's claim for loss of consortium died with her.
Administrator Tanksley cross-appeals and says this was error. He says loss of consortium is a continuing claim, that he had presented colorable proof Ann had experienced it for some two and a half years  from October 8, 1984, until April 21, 1987  and that he was entitled to have the jury pass on it.
Serious personal injury to a man or a woman often deprives his or her spouse of the multivaried joys and benefits of the marital relationship beyond those pecuniary in nature. The loss is qualitatively and quantitatively experiential, its extent occurring though varying from day to day with each day's spousal disability. Where that loss has been tortiously caused, the law of this state recognizes the right of either party to a marriage to bring what has come to be known as an action for loss of consortium. That the sun rises anew does not vitiate the fact of the prior day's loss.
*1167 By reason of the mores of a former day, the right arose in suits by husbands whose wives had been injured. Miss. Code Ann. § 93-3-1 (1972) makes clear the right is not so limited.
A married woman shall have a cause of action for loss of consortium through negligent injury of her husband.
We have articulated the nature and elements of a claim for loss of consortium in a number of cases, principally Tribble v. Gregory, 288 So.2d 13, 16-17 (Miss. 1974). We need not repeat those here, as the Circuit Court in this case denied the claim altogether.
We begin with the survival statute. At all times relevant hereto, our law has provided:
When either of the parties to any personal action shall die before final judgment, the executor or administrator of such deceased party may prosecute or defend such action, and the court shall render judgment for or against the administrator.
Miss. Code Ann. § 91-7-237 (1972).[14] One would think the statute fit this case like a glove. Ann Tanksley was a party to this action. The action certainly seems "personal." Ann died before the final judgment. Her administrator sought to pick up the action and prosecute it. Still, the Court said, "No.".
Scott v. Munn, 245 Miss. 120, 146 So.2d 564 (1962), holds a claim for loss of consortium dies with the spouse holding the claim and may not be revived. It is a decision analogous and anomalous in every way. Marvin N. Munn and Jane Munn were husband and wife and, while they were so, were injured in an automobile accident said to have been caused by one Goldie Lee Metcalfe, "agent, chauffeur and servant" of P.O. Scott. Among the claims asserted, Martin sued for loss of consortium by reason of Jane's disability. While the suit was pending but prior to trial, Marvin died. Jane sought to revive his loss of consortium claim in her capacity as his personal representative and administratrix of his estate, citing what is now Section 91-7-237. We held "that the claim for companionship and consortium died with the husband-plaintiff and cannot be revived." Scott, 245 Miss. at 129, 146 So.2d at 568.
Scott v. Munn is a curious opinion. In the face of the statute and the there-declared-survival of "any personal action," Scott begins, "the first question ... is, was the cause of action ... personal so that it abated, in whole or in part at ... [Marvin's] death?" Scott, 245 Miss. at 124, 146 So.2d at 565-66. At first blush, one would think the question the converse. An action for loss of consortium is rather personal, so that Scott's first question would have been, was the cause of action personal so that it survived?
The Scott Court noted the history of the survival statute, and no doubt appropriately. The language here at issue had then been on the books nigh unto a century. See Rev.Code of Miss. § 1176 (1871). Before that, matters may have been otherwise. Before 1871, the statute contained an exception for "actions of slander, and for injuries or torts done to the person." Hutchinson's Mississippi Code, ch. 49, Art. 1, § 119 (1798-1848). If loss of consortium be an injury or tort done to the person, it did not survive, circa 1848. This exception has not been seen since 1871, and Scott correctly declares the then current law to provide "the actions which may be said to survive the ... intestate are `personal actions.'" Scott, 245 Miss. at 125, 146 So.2d at 566, citing Miss.Code §§ 609, 611 (1942).
Notwithstanding, the Court resorted to a traditional common law distinction between personal actions and suits over property rights. Citing general and secondary authority, Scott says
The line of demarcation at common law separating these causes of action which survive from those which do not is that in the first the wrong complained of affects primarily and principally property and property rights, and the injuries to *1168 the person are merely incidental, while in the latter the injury complained of is to the person, and the property and rights of property affected are merely incidental.
Scott v. Munn, 245 Miss. at 125, 146 So.2d at 566, quoting 1 C.J.S., Abatement and Revival § 132, pp. 178-179. [Emphasis in opinion] The Court immediately notes this view has caused "hardship" and "has never been a favorite with the courts," Scott v. Munn, 245 Miss. at 125, 146 So.2d at 566, and had been done away with in England, and one would have expected a reminder it had been done away with here in then Sections 609 and 611[15] and other enactments and that this ended the inquiry in favor of the survival of Marvin Munn's claim for loss of consortium. Not so. Notwithstanding, the rule and the distinction on which it was based has "never been a favorite" and has caused "hardship" and the further fact that the exception clause excluding "torts done to the person" had not been carried forward into the 1871 version of the survival statute nor re-added since then, the Court proceeds to take the legally discarded distinction quite seriously.
Scott next moves to an old case regarding the distinction between personal actions and penal actions, the relevance of all of which completely escapes us, even if "statutory penalties may not be enforced against the dead." Scott, 245 Miss. at 126, 146 So.2d at 566-67, quoting McNeely v. City of Natchez, 148 Miss. 268, 277, 114 So. 484, 487 (1927). Scott then notes the persistent rule that an action for libel or slander does not survive the death of the plaintiff, see Catchings v. Hartman, 178 Miss. 672, 174 So. 553 (1937), and this is not an irrelevant citation, though this rule has its discrete history and should not have been thought controlling in the present context. These things said, Scott ought to have concluded the statute abolished the old, common law rule that personal actions abate at death and that the statute should be taken at face value, the penalty and libel cases notwithstanding. Instead, Scott reports the Court could find no previous decision on the question of the survival statute extending to a claim of loss of "consortium and companionship as a result of an injury to the wife of a deceased plaintiff," Scott, 245 Miss. at 126, 146 So.2d at 564, and proceeds to out-of-state authority, beginning with Cregin v. The Brooklyn Cross-town Railroad Co., 75 N.Y. 192, 31 Am. Rep. 459 (1878), and later in 83 N.Y. 595, 38 Am.Rep. 474 (1881).
Cregin arose from a New York statute similar to our long since vanished 1848 statute. A husband had sued for the loss of the services and "comforts" of his wife and, as well, out-of-pocket expenses incident to her injury said to have been tortiously inflicted. During the pendency of the action, the husband plaintiff died, and the suit was sought to be revived. Proceeding on the assumption, the husband's claims regarding his "personal comfort" were incidental to his principal claim for pecuniary losses by reason of his wife's injury. Cregin I held the action survived, and Cregin II did indeed recognize the distinction the court relied upon. It is not clear why Scott thought Cregin so important. First, Cregin is based on a statute like our 1848 statute but unlike what has been on our books since 1871. Nothing in Cregin suggests Scott should have read our present (1962) statute to deny survival to Marvin Munn's loss of consortium claim. Second, Cregin has not been given the time of day in the jurisdiction in which it was decided for many years. Indeed, Cregin had enjoyed an absolute and deserved obscurity until Scott revived it 1962.
The Scott Court then moves to Pennsylvania, citing Smith v. Lehigh Valley Railroad Co., 232 Pa. 456, 81 A. 554 (1911), but this makes no sense, for Smith holds unmistakably the precise opposite of Scott's conclusion. Accepting Scott's premise that somehow the 1848 statute remained alive, Smith holds a similar Pennsylvania statute's words "except actions for ... wrongs done to the person" did not exclude from survival a husband's right for loss of consortium or services of his wife. "Wrongs done to the person" [our 1848 *1169 statute read "injuries or torts done to the person"] were limited to two "wrongs in the nature of physical injuries done to the person of the plaintiff decedent." Smith, 232 Pa. at 460, 81 A. at 555. The unequivocal rule of Smith is that, even under our 1848 statute, a husband's right to recover damages for the loss of the services of his wife through tortious injury to her should be held to survive to his personal representatives after the husband's death. Seemingly unaware the Pennsylvania case had just destroyed any semblance of a respectable predicate for its chosen course, Scott grabs a sentence of obiter dicta from an alienation of affections case in Wisconsin and holds Marvin Munn's claim for loss of consortium died when he died.
Properly analyzed, Scott rests upon a statute no longer on the books, upon a distinction between types of actions never a "favorite," and upon a nineteenth century New York case which had lived in virtual obscurity since it was decided. Scott ignores the clear wording of the survival statute as it read in 1962 and even cited the 1911 Pennsylvania case which explained why, even under the archaic and formalistic view of the law Scott accepted, its ultimate holding was wrong. And we would note, since it was decided back in 1962, Scott has hardly engendered substantial reliance in this Court or elsewhere. See Tideway Oil Programs, Inc. v. Serio, 431 So.2d 454, 465-66 (Miss. 1983).
The holding in Scott goes against both logic and history. We all know there was a time when a tort action was thought a personal action and that it died with its holder. This rule was abolished by the famous Lord Campbell's Act in England in 1846. The history of wrongful death actions in this state may be found in Illinois Central Railroad Co. v. Fuller, 106 Miss. 65, 63 So. 265 (1913). The logic behind the rule recognized in Scott v. Munn was dispatched with our wrongful death act. Miss. Code Ann. § 11-7-13 (Supp. 1991). Moreover, many states now recognize a claim for loss of consortium survives the death of a plaintiff. Zimmerman v. Lloyd Noland Foundation, Inc., 582 So.2d 548 (Ala. 1991), Ala. Code §§ 6-5-410, 6-5-440, 6-5-462 (1975); Johnson v. Simonelli, 231 Cal. App.3d 105, 282 Cal. Rptr. 205 (1991); Koltyn v. Transportation Insurance Co., 163 Wis.2d 965, 473 N.W.2d 609 (1991) (unpublished opinion); Bryant v. Kroger Co., 212 Ill. App.3d 335, 156 Ill.Dec. 487, 570 N.E.2d 1209 (1991), Ill. Rev. Stat. ch. 110 1/2, para. 27-6 (Smith-Hurd 1990). If there was ever a day when the non-survival rule made sense, that day has long passed.
The bottom line, however, is our statute. Section 91-7-237 provides unequivocally that, where a party "to any personal action" dies pending final judgment, his or her executor or administrator may pick up the action and prosecute it to conclusion. The suggestion that a suit for loss of consortium may somehow be excluded from the category "any personal action" is at best a bit of formalistic nonsense. But even if one holds to the fiction that there can be no wrongful death action absent statute, a fiction forever interred in Moragne v. States Marine Lines, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970), and Sea-Land Services, Inc. v. Gaudet, 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974), we have such a statute. We hold today an action for loss of consortium does survive the death of the party asserting it, that it may be brought as any other action by the executor or administrator or personal representative of the deceased party, and that the Circuit Court erred in dismissing Ann Tanksley's claim for loss of consortium. We reverse and remand for plenary trial on the merits of this claim.

VIII.
On direct appeal, Flight Line presses several further points. We have considered these with care and find none merits discussion or reversal. The same may be said of Tanksley's two other issues on cross-appeal.
ON DIRECT APPEAL, AFFIRMED; ON CROSS-APPEAL, AFFIRMED IN PART AND REVERSED IN PART AND REMANDED.
*1170 ROY NOBLE LEE, C.J., HAWKINS, P.J., and PRATHER, SULLIVAN, PITTMAN, BANKS and McRAE, JJ., concur.
DAN M. LEE, P.J., concurs in result only.
NOTES
[1] For venue purposes, the domicile of a corporation is the county of its principal place of business. Plummer-Lewis Co. v. Francher, 111 Miss. 656, 661, 71 So. 907 (1916).
[2] This rule does not preclude later inquiry into transfer via forum non conveniens. Missouri Pacific Railroad Co. v. Tircuit, 554 So.2d 878, 881-83 (Miss. 1989); Illinois Central Gulf Railroad Co. v. Stedman, 344 So.2d 468, 471 (Miss. 1977); Abbott, Venue of Transitory Actions Against Resident Individual Citizens in Mississippi, 58 Miss.L.J. 1, 12-19 (1988); but see, Rule 82(d), Miss.R.Civ.P.
[3] In his Amended Complaint, Tanksley particularized his charge of negligence in paragraph VI-B. In relevant part, he charged:

1. That the decision to use the aircraft in question after having seen the load was not reasonable under the circumstances as they then and there existed at the Vicksburg-Warren County Airport;
2. That the loading of the aircraft at the Vicksburg-Warren County airport was done negligently, specifically but not exclusively because of the failure to tie down and accurately distribute the load of cargo;
4. That the Defendant negligently failed to furnish in Vicksburg, Mississippi an adequately trained and experienced pilot with regard to experience in making proper and reasonable decisions with regard to loading and transporting cargo[.]
[4] We find instructive our experience in personal jurisdiction problems in products liability suits against non-residents. The context invariably is that the defendant has manufactured the said-to-have-been-defective product in another state and placed it in the stream of commerce via which it ultimately arrives in Mississippi. Before plaintiff may hale the non-resident into this state's courts, he must show the tort has been committed "in whole or in part in this state... ." Miss. Code Ann. § 13-3-57 (Supp. 1991). On the premise that the injury occurs in this state and the tort is not complete until the injury occurs, we have consistently sustained personal jurisdiction in such cases. In doing so, we have reasoned "the tort is committed, at least in part, in this state." Smith v. Temco, Inc., 252 So.2d 212, 216 (Miss. 1971), followed in Anderson v. Sonat Exploration Co., 523 So.2d 1024, 1025 (Miss. 1988); Wilkinson v. Mercantile National Bank At Dallas, 529 So.2d 616, 618 (Miss. 1988). Here we but report the obvious. Though essential, the injury is not the whole tort. In such a case the tort is committed in part here where the injury occurs and in part elsewhere where the product has been manufactured. The analogy is apt, albeit imperfect.
[5] Jury Instruction No. P-25 in its entirety reads as follows:

The Court instructs the jury that should you find by a preponderance of the evidence that either the pilot, Bob Avery, or the dispatcher, Cougar Easley, were negligent as shown from a preponderance of the evidence, then the Court instructs you that the negligence if any, of Mr. Avery and/or Mr. Easley is imputed to and thus becomes negligence of the defendant, Flight Line, Inc. If you further find that the Plaintiff, HOWARD TANKSLEY, was damaged in whole or in part because of the negligence of the aforesaid persons or either of them then you should return a verdict in favor of the Plaintiff, HOWARD TANKSLEY.
[6] Instruction No. P-33, in its entirety, reads as follows:

The Court instructs the jury that should you find from a preponderance of the evidence that the pilot, Bob Avery, had a duty to exercise reasonable care to see to the safety of his passengers by being present at unloading or to protect them reasonably from the dangers of the aircraft and that he negligently failed to do so and further that HOWARD TANKSLEY was injured as a proximate result of this negligent failure on the part of the pilot, Bob Avery. Should you so find by a preponderance of the evidence that Bob Avery breached his duty to reasonably protect his passengers from the dangers of unloading this aircraft and that HOWARD TANKSLEY was injured as a result of that failure then it is your duty to return a verdict in favor of the Plaintiff against the defendant, Flight Line, Inc.
[7] Jury Instruction No. P-34, in its entirety, reads as follows:

The Court instructs the jury that should you find from a preponderance of the evidence that the pilot, Bob Avery, had a duty to supervise the unloading of this aircraft upon its arrival and that he knew or should have known that the Magnolia Marine employees were going to unload the aircraft as soon as possible and if you further find from a preponderance of the evidence that the pilot negligently failed to be present at the unloading of the aircraft in Chicago and that HOWARD TANKSLEY was proximately injured as a result of this negligence, if any, it is your duty to return a verdict in favor of the Plaintiff, HOWARD TANKSLEY.
[8] Jury Instruction C-1 reads as follows:

... You are instructed that the word "negligence" as used in these instructions means the doing of some act which a reasonably prudent person would not do under the same or similar circumstances, or the failure to do some act which a reasonably prudent person would do under the same or similar circumstances.
[9] Jury Instruction D-38 reads as follows:

In order the the (sic) alleged failure to exercise reasonable care, which is called negligence in the law, to afford a basis for a monetary recovery, you the jury must find that the Defendant had the ability, viewing the matter prospectively and without benefit of hindsight, to foresee that some damage, and not necessarily the exact damage which occurred, was reasonably likely to occur as a result of the failure to exercise reasonable care.
In other words, you must find for the Defendant in the case if you find from a preponderance of the evidence that the Defendant did not, in the exercise of reasonable care and foresight, have the ability to foresee that its acts or omissions were reasonably likely to cause harm to Howard Tanksley. Your verdict must be for the Defendant if you find that the Defendant could not, in the exercise of reasonable care and foresight, foresee the accident which allegedly occurred, and this would be true if you find the Defendant committed some mistake on the occasion of the alleged accident.
[10] Jury Instruction D-43 reads as follows:

You are instructed that the training, expertise, knowledge and experience of the pilot of the aircraft will not make out a case of actionable negligence unless you find that the training, skill, knowledge and expertise of the said pilot was a proximate contributing cause of the alleged accident and Plaintiff's alleged injuries. In other words, if you find that the pilot's operation of the aircraft, loading and other actions were reasonable and adequate, you must find for the Defendant Flight Line, Inc., whether or not you find that the training, skill and expertise of the pilot was adequate.
[11] Miss. Code Ann. § 11-1-55 reads as follows:

Authority to impose condition of additur or remittitur.
The supreme court or any other court of record in a case in which money damages were awarded may overrule a motion for new trial or affirm on direct or cross appeal, upon condition of an additur or remittitur, if the court finds that the damages are excessive or inadequate for the reason that the jury or trier of the facts was influenced by bias, prejudice, or passion, or that the damages awarded were contrary to the overwhelming weight of credible evidence. If such additur or remittitur be not accepted then the court may direct a new trial on damages only. If the additur or remittitur is accepted and the other party perfects a direct appeal, then the party accepting the additur or remittitur shall have the right to cross appeal for the purpose of reversing the action of the court in regard to the additur or remittitur.
[12] Rule 702, in its entirety, reads as follows:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
[13] Rule 703, in its entirety, reads as follows:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.
[14] Miss. Code Ann. § 91-7-233 (1972) is to like effect for actions not yet commenced at the time of plaintiff's death.
[15] These are today's Sections 91-7-233 and -237.