# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2005-CA-01613-SCT

*RONALD A. BULLOCK, M.D.*

*v.*

*W. L. LOTT AND LAURA LOTT, INDIVIDUALLY,
AND ON BEHALF OF THE WRONGFUL DEATH
BENEFICIARIES, AS PARENTS OF DUSTIN LOTT,
A DECEASED MINOR*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/02/2005 |
| TRIAL JUDGE: | HON. ROBERT G. EVANS |
| COURT FROM WHICH APPEALED: | COVINGTON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | J. ROBERT RAMSAY |
| | AMANDA CLEARMAN WADDELL |
| ATTORNEYS FOR APPELLEES: | NORMAN WILLIAM PAULI, JR. |
| | RAY T. PRICE |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| DISPOSITION: | REVERSED AND REMANDED - 09/13/2007 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1.     W. L. Lott and Laura Lott, the parents of Dustin Lott, filed a wrongful death and medical malpractice action against Ronald A. Bullock, M.D., alleging that Dustin Lott died as a result of Dr. Bullock's negligent failure to provide adequate medical care. Specifically, the plaintiffs rely upon the theory of "loss of chance" of "greater" recovery. Finding that the trial court erred in permitting Dr. Gibson to testify regarding purported facts not supported by the evidence, we are constrained to reverse the Covington County Circuit Court's

judgment in favor of the Lotts and to remand this case for a new trial consistent with this opinion.

## FACTS AND PROCEEDINGS IN THE TRIAL COURT

¶2.    On Friday, January 26, 2001, Dustin Lott (Dustin), who was sixteen years old, was taken to the office of Ronald A. Bullock, M.D., by his mother, Laura Lott.  Dustin's chief complaint concerned four headaches associated with nausea and vomiting over the last month.  Dr. Bullock examined Dustin and his notes indicate Dustin complained that at times these headaches were associated with flashing lights.  Dustin had no history of head trauma; however, Dustin continued to have sinus congestion and yellow drainage for which Dr. Stephen Massey had recently treated him.[1]  Dr. Bullock's examination revealed that Dustin had moderate nasal congestion with yellow exudate.  The remainder of the examination was normal.  Dr. Bullock diagnosed Dustin with migraine headaches and sinusitis and prescribed Dustin a Z-pak and Prednisone 40 mg, a steroid.  Additionally, Dr. Bullock gave Dustin some Midrin capsules for his migraines.  Two days later on Sunday, January 28, 2001, Dustin died in his sleep at his home in Seminary, in Covington County.

---

[1]On January 7, 2001, Dustin was treated by Dr. Massey.  His chief complaint was onset of sore ears and throat, headaches, and some fever.  Dr. Massey noted a temperature of 96 degrees and prescribed Dustin a Z-pak.  Four days later, on January 11, 2001, Dustin again returned to Dr. Massey's office complaining of nasal and sinus congestion, intermittent ear pain, a cough, periodic headaches, and nausea and vomiting that morning.  Dustin again had a temperature of 96.4 degrees.  Since Dustin had almost completed the Z-Pak regimen as prescribed by Dr. Massey on January 7, 2001, Dr. Massey further prescribed Dustin Histex SR and Phenergan 25 mg on January 11, 2001.

¶3.     Immediately following Dustin's death, on Monday, January 29, 2001, a post mortem examination was performed by Dr. Steven T. Hayne. Dr. Hayne's autopsy report stated that Dustin's immediate cause of death was an intraventricular abscess to the brain and concluded Dustin's underlying cause of death to be findings suggestive of sinusitis. Dr. Hayne did not testify at trial.

¶4.     On December 30, 2002, W. L. Lott and Laura Lott, Dustin's parents, filed a wrongful death and medical malpractice action against Drs. Bullock and Massey in the Circuit Court of Covington County. The Lotts alleged that Dr. Bullock and Dr. Massey should have included possible brain abscess in their differential diagnoses of Dustin. The Lotts maintained that Dr. Bullock and Dr. Massey were both negligent by not ordering a CT scan, MRI and/or waters view,[2] or sinus x-ray which would have revealed that Dustin had a brain abscess. Furthermore, the Lotts alleged that Dr. Bullock and Dr. Massey breached the standard of care by not conducting such tests in order to rule out this condition, and that this negligence caused Dustin's death.

¶5.     On April 9, 2003, Dr. Bullock filed a motion for change of venue alleging that venue was proper in Forrest County, where the treatment of Dustin occurred, as opposed to Covington County, where Dustin died. On May 15, 2003, Dr. Massey likewise filed a motion for change of venue, asserting that venue was proper in either Forrest County or Lamar County, where either doctor practiced medicine, but not in Covington County, where

---

[2]"Waters view" is a medical eponym for the radiographic positioning technique that provides an occipitomental view of the midface.

3

Dustin died. On March 28, 2005, the Lotts responded to these motions, and on May 3, 2005, the trial court denied both motions for change of venue.[3] On May 9, 2005, the trial court granted the Lotts' *ore tenus* motion to dismiss Dr. Massey, only, with prejudice.

¶6.    On June 17, 2005, Dr. Bullock filed a Motion in Limine Regarding the Anticipated Testimony of Dr. Larry Gibson, who was the Lotts' sole trial medical expert. On June 22, 2005, Dr. Bullock filed an Amended Motion in Limine Regarding the Anticipated Trial Testimony of Dr. Larry Gibson, asserting that Dr. Gibson had amended his opinion and that Dr. Gibson should thus be prohibited from offering these supplemental opinions. The trial judge denied Dr. Bullock's motions in limine, and on June 27, 2005, the trial of this case commenced with Judge Robert G. Evans presiding.

¶7.    Dr. Larry F. Gibson, a family practice physician, was tendered as an expert "in family practice and urgent care medicine" and accepted by the trial court as an expert "in the fields tendered" to offer opinion testimony on behalf of the plaintiffs. Dr. Gibson testified that the proper standard of care when a physician is confronted with the symptoms exhibited by Dustin was to order a CT scan, MRI, or culture and sensitivity test to determine whether the patient was suffering from a brain infection. Dr. Gibson testified that Dr. Bullock breached the standard of care by not ordering a CT scan, MRI, or culture and sensitivity test. Dr. Gibson further opined that (1) had Dr. Bullock ordered a CT scan, MRI, or culture and

---

[3]Since the Lotts commenced their suit on December 30, 2002, Miss. Code Ann. § 11-11-3(3) (Rev. 2004) (as amended, eff. from and after Sept. 1, 2004, and applicable to all causes of action filed on or after Sept. 1, 2004), does not apply in today's case.

4

sensitivity test, (2) had the test results come back positive, and (3) had Dustin been admitted into the hospital to receive the proper care, Dustin would have had at least a fifty-percent chance of surviving.

¶8.     Dr. Bullock called three medical experts to rebut Dr. Gibson's testimony – Dr. James Lauridson, Dr. Edwin Dennard, and Dr. John Lancon.  Dr. Lauridson, a forensic pathologist, testified that Dustin's cause of death was not intraventricular brain abscess but spontaneous purulent ventriculitis, a rare condition with a very rapid onset. Dr. Dennard, a board-certified family medicine physician, testified that Dr. Bullock had fully met the standard of care.  Dr. Dennard further stated that Dr. Bullock had made the correct diagnosis based on Dustin's medical records and complaints.  Dr. Lancon, a board-certified pediatric neurosurgeon, testified that Dustin's neurological examination was normal and that there was no indication that further testing was needed.  In fact, Dr. Lancon testified that even had Dustin been referred to him, he would not have obtained a CT scan or an MRI scan.

¶9.     During trial, Dr. Bullock moved to strike the portion of counsel's cross-examination of Dr. Bullock using an article found on the internet from the University of Maryland Medical School, on the basis that such cross-examination was not permissible under Miss. R. Evid. 803(18).  The trial court found that cross-examination with the article was acceptable as long as the article was not admitted into evidence.  Additionally, during the cross-examination of Dr. Dennard, the Lotts' counsel questioned Dr. Dennard from a learned treatise taken from the internet entitled *Primary Care Medicine* by Nobles, published by

5

Mosby. Again, Dr. Bullock objected on the basis of Rule 803(18), but the Lotts' counsel was permitted to cross-examine Dr. Dennard using *Primary Care Medicine*.

¶10.    At the conclusion of the presentation of the evidence, on July 1, 2005, the jury returned a unanimous verdict for the Lotts in the amount of $400,000. On July 8, 2005, the trial court entered a judgment consistent with the jury verdict, and the Lotts filed a Motion for Additur and, in the Alternative, a Motion for a New Trial on the Issue of Damages Only. On July 15, 2005, Dr Bullock filed his Response and Objection to the Motion for Additur and, in the Alternative, a Motion for a New Trial on the Issue of Damages Only. In addition, Dr. Bullock filed a Motion for Judgement Notwithstanding the Verdict or Alternatively for a New Trial.

¶11.    The trial court heard these motions on July 29, 2005, and on August 3, 2005, it entered an order granting an additur in the amount of $250,000, stating that the verdict was against the overwhelming weight of the evidence, pursuant to Miss. Code Ann. § 11-1-55 (Rev. 2002). Consistent with the statute, the trial court also alternatively ordered a new trial on the issue of damages only (if the additur was not accepted). On August 8, 2005, the Lotts filed their Notice of Acceptance of Additur. On August 10, 2005, the trial court entered an order denying Dr. Bullock's Motion for a Judgment Notwithstanding the Verdict and New Trial. On August 12, 2005, Dr. Bullock filed his notice of appeal with this Court assigning the following errors:

(1) The trial court erred in denying Dr. Bullock's motion to change venue;

6

(2)   The trial court erred in allowing the plaintiffs' expert, Dr. Gibson, to testify over the defendant's **Daubert** objections;

(3)  The trial court erred in allowing Dr. Bullock and a defense medical expert, Dr. Dennard, to be cross-examined on articles which were not properly authenticated under Miss. R. Evid. 803(18);

(4) Plaintiffs' counsel made improper and unfairly prejudicial statements during closing arguments;

(5)  The trial court erred in denying Dr. Bullock's motion for directed verdict and motion for judgment notwithstanding the verdict;

(6)  The trial court erred in granting the plaintiffs' motion for additur.[4]

## DISCUSSION

### I.   MOTION TO TRANSFER VENUE

¶12.   When reviewing the trial court's denial of a motion to change venue, we apply an abuse of discretion standard of review.  **Crenshaw v. Roman**, 942 So. 2d 806, 809 (Miss. 2006); **Am. Home Prods. Corp. v. Sumlin**, 942 So. 2d 766, 768 (Miss. 2006).  Thus, on appeal we will not overrule a trial court's ruling "unless it clearly appears that there has been an abuse of discretion or that the discretion has not been justly and properly exercised under the circumstances of the case."  **Crenshaw**, 942 So. 2d at 806 (quoting **Guice v. Miss. Life Ins. Co.**, 836 So. 2d 756, 758 (Miss. 2003)).

¶13.   Dr. Bullock resides and practices medicine in Forrest County, and he provided treatment to Dustin Lott in Forrest County.  Likewise, Dr. Massey, who initially was joined

---

[4]Because of our ultimate disposition in this case, it is unnecessary to discuss our recent decision in **Dedeaux v. Pellerin Laundry, Inc.**, 947 So. 2d 900 (Miss. 2007), concerning additurs and remittiturs.

7

with Dr. Bullock when the Lotts filed suit, resides and practices medicine in Lamar County and provided treatment to Dustin Lott in Lamar County. Therefore, Dr. Bullock and Dr. Massey moved for a change of venue from Covington County to Forrest County or Lamar County. These motions were denied on May 2, 2005, and the case proceeded to trial in the Circuit Court of Covington County. Dr. Bullock now asks this Court to consider whether, in a wrongful death action, venue is still proper in the county where the death occurred. Dr. Bullock makes this request in light of such cases as ***Baptist Mem. Hospital-DeSoto, Inc. v. Bailey***, 919 So. 2d 1 (Miss. 2005); ***Namihira v. Bailey***, 891 So. 2d 831 (Miss. 2005); and ***Capital City Ins. Co. v. G.B. Boots Smith Corp.***, 889 So. 2d 505 (Miss. 2004). Dr. Bullock contends that venue is proper only in Forrest County or Lamar County, the counties where the alleged negligence occurred.

¶14. On the other hand, the Lotts contend that based on the general venue statute, Miss. Code. Ann. § 11-11-3 (Supp. 2002) and case law in effect at the time of the filing of their complaint on December 30, 2002, venue was also proper in Covington County. Because the Lotts filed their complaint in 2002, the amendments to the general venue state which went into effect on January 1, 2003, are not applicable to today's case. At the time this case was commenced, Miss. Code Ann. § 11-11-3 (Supp. 2002) stated in pertinent part:

> Civil actions of which the circuit court has original jurisdiction shall be commenced in the county in which the defendant or any of them may be found **or in the county where the cause of action may occur or accrue** . . . .

8

Section 11-11-3 (2001) was amended in 2002.  *See* 2002 Miss. Laws, 3rd Ex. Sess., ch. 2,

§ 1, eff. January 1, 2003; 2002 Miss. Laws, 3rd Ex. Sess., ch. 4, 1, eff. January 1, 2003

(emphasis added).

¶15.    Thus, when determining permissible venues with regard to a wrongful-death cause of

action filed before January 1, 2003, we must look to where the cause of action occurred or

accrued.  In *Sumlin*, also a pre-2003 amendment case, we outlined the differences between

"occur and accrue" within the meaning of Section § 11-11-3:

> "Occur" and "accrue" are not synonymous, legally or otherwise, as the disjunctive connector forthrightly suggests. *We read accrual in its formalistic sense.  A cause of action accrues when it comes into existence as an enforceable claim, that is, when the right to sue becomes vested.* ***Forman v. Mississippi Publishers Corp.***, 195 Miss. 90, 104, 14 So. 2d 344, 346 (1943). This may well mean the moment injury is inflicted, that point in space and time when the last legally significant fact is found.  *"Occur" is a less formalistic term*.  It is event oriented to its core.  It connotes conduct and phenomena and imports no preference among all of those necessary that a plaintiff may sue. In the final analysis, *venue is about convenience*.  The legislative prescription implies a certain criteria will generally be more convenient to the parties.  The use of "occur" makes sense because important witnesses will often be accessible where the action occurs.  *Yet, there is nothing in the phrase, "where the cause of action may occur. . . ." that limits the judicial search for but a single county*.  Torts arise from breaches of duties causing injuries, and it is common experience that breach and causation and impact do not always happen at once.  At the very least, the word "occur" *connotes each county in which a substantial component of the claim takes place*, and this may include, in the present context, the negligent conduct which undergirds [the plaintiff's] claim.

(Emphasis in original). *Sumlin*, 942 So. 2d at 770-71 (quoting ***Braswell v. T & T Welding,***

***Inc.***, 883 So. 2d 82, 84 (Miss. 2004) (citing ***Flight Line, Inc. v. Tanksley***, 608 So. 2d 1149,

1156-57 (Miss. 1992)).

9

¶16.    Where the cause of action accrued is relevant to today's case.  In ***Burgess v. Lucky***, 674 So. 2d 506, 508 (Miss. 1996), this Court interpreted statute-of-limitations cases regarding when a cause of action accrues and held that "[a] cause of action accrues only when it comes into existence as an enforceable claim; this is, when the right to sue becomes invested." ***Id***. (citing ***Owens-Illinois, Inc. v. Edwards***, 573 So. 2d 704, 706 (Miss. 1990) (quoting ***Rankin v. Mark***, 238 Miss. 858, 120 So. 2d 435 (1960)).  Additionally, "in a wrongful death case 'the cause of action does not accrue until the death of the negligently injured person.'" ***Id***. (quoting ***Gentry v. Wallace***, 606 So. 2d 1117, 1119 (Miss. 1992)).[5] Therefore, "a cause of action does not necessarily 'occur['] and 'accrue' at the same time or place." ***Id***. at 509 (citing ***Flight Line***, 608 So. 2d 1149).  We went further to conclude that the same reasoning should apply to venue issues.

¶17.    Applying the same rationale to the case *sub judice*, venue would be proper in Covington County, the county of death, and Forrest County or Lamar County, the counties where negligence allegedly happened.  However, Dr. Bullock asserts that our decisions in ***Capital City***, ***Namihira***, and ***Baptist*** make it clear that ***Burgess*** no longer applies because it is inconsistent with the general venue statute, Miss. Code Ann. § 11-11-3.  Dr. Bullock's reliance on these cases is misplaced.

---

[5]In ***Jenkins v. Pensacola Health Trust, Inc.***, 933 So. 2d 923, 926 (Miss. 2006), we overruled ***Gentry*** and held "that the statute of limitations on bringing a wrongful death claim is subject to, and limited by, the statute of limitations associated with the claims of specific wrongful acts which allegedly led to the wrongful death." ***Id.*** at 926.  However, ***Burgess*** and ***Gentry*** are cited here for our discussion of the distinction between "accrue" and "occur," which distinction remains the same notwithstanding the fact that ***Gentry*** has been overruled.

10

¶18. In *Capital City*, we dealt with two competing venue statutes, Miss. Code Ann. § 11-11-3, the general venue statute, and Miss. Code Ann. § 11-11-7, our venue statute governing suits against insurance companies. We held that the general venue statute is mandatory while the venue statute applicable to insurance companies is permissive. *Capital City*, 889 So. 2d at 516. Thus, the general venue statute is ranked above other permissive venue statutes in cases in which more than one statute applies. *Id*. at 517. *Capital City* did not conclude where there is a resident defendant the plaintiff may never sue in his home county as Dr. Bullock would have this Court believe.

¶19. Furthermore, in *Namihira*, the plaintiff petitioned the court for a transfer of venue asserting the inability to seat an impartial jury. *Namihira*, 891 So. 2d at 831-32. *Namihira* does not deal with a wrongful-death cause of action. In addition, the question of whether a plaintiff may ever sue in the plaintiff's home county was not before this Court. Thus, *Namihira* does not aid Dr. Bullock.

¶20. Lastly, Dr. Bullock asserts *Baptist* controls and establishes venue for a medical malpractice action either in the county where a resident hospital maintains its principal place of business or where the patient receives the allegedly negligent care. It is important to note that in *Baptist,* Section 11-11-3 already had been amended to eliminate the word "accrue" because the medical malpractice action was filed on September 9, 2003. The Lotts no doubt concede that if the current general venue statute had been in effect at the time they filed their complaint, then venue would not have been proper in Covington County. Since the pre-2003

11

version applied in today's case, the Lotts are correct that venue was indeed proper in Covington County, Forrest County, and Lamar County.[6]

¶21. "Of right, the plaintiff selects among the permissible venues, and his choice must be sustained unless in the end there is no factual basis for the claim of venue." *Sumlin*, 942 So. 2d at 769 (citing *Forrest County Gen. Hosp. v. Conway*, 700 So. 2d 324, 326 (Miss. 1997) (quoting *Flight Line*, 608 So. 2d at 1155)). Put another way, the trial court "must give the plaintiff the benefit of the reasonable doubt, and we do so on appeal as well." *McMillan v. Puckett*, 678 So. 2d 652, 656 (Miss. 1996). Therefore, the trial court was correct in denying Dr. Bullock's motion to change venue.

## II.    EXPERT TESTIMONY

¶22. Prior to trial, Dr. Bullock filed a motion in limine asking the trial court to exclude the anticipated trial testimony of Larry F. Gibson, M.D. In particular, Dr. Bullock asserted that Dr. Gibson's anticipated trial testimony failed to meet either of the two prongs of the test outlined in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and that, essentially, Dr. Gibson's anticipated trial testimony was both irrelevant and unreliable. Dr. Bullock's first main objection is that Dr. Gibson's opinions were based on a post-mortem report performed by Dr. Steven Hayne, wherein Dr.

_____

[6]Again, it goes not unnoticed by us that section 11-11-3 was again amended in 2004 such that section 11-11-3(3) now states in pertinent part: "Notwithstanding subsection (1) of this section, any action against a licensed physician . . . . [who] may be liable for . . . acts or omissions, for malpractice, negligence, error, omission, mistake, breach of standard of care . . . . shall be brought only in the county in which the alleged act or omission occurred." But, as already noted, this amendment does not apply to our case today.

Hayne opined that the visual gross examination of the frontal sinuses reveals a *suggestion* of acute sinusitis with vascular congestion and lists findings *suggestive* of sinusitis as the underlying cause of death. Therefore, Dr. Bullock admittedly asserts that the foundation of Dr. Gibson's testimony is expressed in terms of a medical possibility rather than a medical probability; thus, completely unreliable.

¶23. Next, Dr. Bullock objects to the scope of Dr. Gibson's testimony. Essentially, Dr. Bullock asserts that Dr. Gibson was not qualified to render opinions solely within the purview of a neurosurgeon, radiologist or pathologist when testifying to the gold standard of care in this wrongful death/medical malpractice case. Dr. Bullock alleges Dr. Gibson exceeded the scope of his expert designation; Dr. Gibson was not competent or qualified to give opinions as to whether a CT scan, an MRI, or a sinus x-ray would have shown a brain abscess at the time Dustin was in Dr. Bullock's office; that Dr. Gibson's testimony failed to establish by a reasonable degree of medical certainty and/or probability that a sinus infection or condition led to decedent's death; **and that Dr. Gibson's testimony was not based on sufficient facts or data;** thus, Dr. Gibson's testimony was unreliable.

¶24. Since the trial judge had not ruled on Dr. Bullock's motion in limine before trial, the trial judge conducted an evidentiary hearing on the issue of whether Dr. Gibson was qualified as an expert to testify for the purpose of establishing the standard of care that Dr. Bullock, as a family practice physician, should have followed during the office visit of January 26, 2001. The trial court allowed Dr. Gibson to testify that the gold standard of care was to order a CT scan, over the numerous objections of defense counsel and stated:

13

It's my finding that the standard of care, past history, course of examination for the symptoms presented and general reading of CT scans encountered in family practice grows naturally and directly out of the practice of family medicine, that Dr. Gibson's experience and training in reading CT scans was based on generally accepted principles in that discipline and, therefore, the motion [in limine] is overruled. The findings were some of the suggested Daubert factors.

¶25. We apply an abuse-of-discretion standard of review when reviewing the trial court's decision to allow or disallow evidence, including expert testimony. *Webb v. Braswell*, 930 So. 2d 387, 396-97 (Miss. 2006) (citing *Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 34 (Miss. 2003)). A trial court's decision to allow expert testimony will be affirmed "[u]nless we can safely say that the trial court abused its judicial discretion in allowing or disallowing evidence so as to prejudice a party in a civil case, or the accused in a criminal case." *Jones v. State*, 918 So. 2d 1220, 1223 (Miss. 2005) (citing *McGowen v. State*, 859 So. 2d 320, 328 (Miss. 2003)). Furthermore, "a motion in limine should be granted only if '(1) the material or evidence in question will be inadmissible at a trial under the rules of evidence; and (2) the mere offer, reference, or statements made during trial concerning the material will tend to prejudice the jury.'" *McLemore*, 863 So. 2d at 34 (quoting *Whittley v. City of Meridian*, 530 So. 2d 1341, 1344 (Miss. 1988)).

¶26. Thus, the issue before this Court is whether the trial judge abused his discretion by permitting Dr. Gibson to testify hypothetically what a CT scan would have shown had it been performed on Dustin on January 26, 2001. Put another way, was the expert testimony allowed at trial both relevant and reliable?

14

¶27. Miss. R. Evid. 702, as amended in 2003, addresses the admissibility of expert testimony, and reads:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Miss. R. Evid. 702 (identical to its counterpart in the Federal Rules of Evidence). Therefore, while an expert may be qualified to give an opinion in a particular area of expertise, the testimony must now be based upon sufficient facts or data; the testimony must be the product of reliable principles and methods; and the expert must have applied the principles and methods reliability to the facts of the particular case. Miss. R. Evid. 702.

¶28. The most important guideline is for the trial judge "to act as a gatekeeper, ensuring that expert testimony is both relevant and reliable." *Poole v. Avara*, 908 So. 2d 716, 723 (Miss. 2005) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)); *McLemore*, 863 So. 2d at 36. In determining relevance of an expert's testimony, the trial judge should consider if the testimony will assist the trier of fact. *Poole*, 908 So. 2d at 723 (citing *Daubert*, 509 U.S. at 591).

¶29. The trial judge acted well within his discretion by accepting Dr. Gibson as an expert in family practice and urgent care medicine to offer opinion testimony in this case, although during defense counsel's voir dire and cross-examination of Dr. Gibson, his expert qualifications were vigorously attacked. Dr. Gibson had been licensed to practice medicine

15

in Mississippi for approximately eighteen years, as well as being a registered pharmacist. Dr. Gibson was board-certified in family practice until 2002, but at the time of trial was only board-eligible; Dr. Gibson was board-certified in urgent care medicine at the time of trial. Dr. Gibson was a member of the American Medical Association, Mississippi State Medical Association; and American Academy of Urgent Care. Dr. Gibson had ordered multiple CT scans, had communicated with radiologists who perform the CT scans and understood the findings of CT scans. Dr. Gibson was capable of reading post mortem reports. Additionally, Dr. Gibson was familiar with sinusitis and brain infections, along with the standard of care applicable when a family practice medical doctor should order a CT scan to rule out a central nervous system infection, such as a brain infection.

¶30.    While Dr. Gibson met the *Daubert* qualifications to testify as an expert in the fields tendered, portions of Dr. Gibson's testimony were not based on sufficient facts or data.

¶31.    In particular, today's case addresses a situation involving an expert offering opinions based on facts not in evidence. *See also Stubbs v. State*, 845 So. 2d 656, 670 (Miss. 2003), (a pre-Rule 702 amendment case in which we cautioned the trial bench and bar to take care that an expert's testimony was confined to his/her area of expertise).

¶32.    We thus take this opportunity to remind our trial judges of their solemn gate-keeping responsibilities consistent with *Daubert*, our amended Rule 702, and *McLemore* and its progeny, whether it be assuring that an expert is confined to offering opinions within his/her areas of expertise or assuring that an expert's testimony is based upon sufficient facts and

16

data, is the product of reliable principles and methods, and is based on the principles and methods having been applied reliably to the facts of the case.

¶33.   With all of this in mind, we note here that Dr. Gibson repeatedly testified that, (and defense counsel repeatedly objected) a CT scan would have shown a midline shift. Specifically, Dr. Gibson opined:

Q.   . . . When you order a CT scan to rule out the presence of any of those approximately five different brain disorders that you mentioned in your differential, would you tell the jury why a CT scan is the appropriate test to order and what are you looking for when you order it?

MR. AULTMAN:   To which we object, Your Honor. This is outside the field of his expertise, Judge.

THE COURT:   I think he can answer that.

A.   When you order a CT scan of the head, it depends on what you're looking for, what you suspect. In this case of an abscess, you would be looking for a shift in what we call the midline. The midline is this line, right here (Indicating), from the front to the back.

MR. AULTMAN:   Your Honor, may we review this? This is getting into the field of pathology.

THE COURT:   Overruled. I'll give you my explanation later. But I think he met the qualifications outside the presence of the jury for – not for pathology. And your motion as to pathology is overruled.

MR. AULTMAN:   Okay, sir.

MR. PAULI CONTINUING:

Q.   To make sure, I'll just get your response. You're saying, if you drew an imaginary line –

17

A.     Uh-huh.  (Affirmative Response)

Q.     – right down the vertical center of this chart, that's what you're saying is the midline?

A.     Yeah.  The brain is divided into hemispheres, the left and the right, and this is the dividing line that comes down between, right here (Indicating), in the middle.  And whenever you have – order a CT scan, what you're looking for on this thing is you're looking for a deviation in this midline.  If there's a foreign body like a tumor or a collection of pus on one side or the other, it's going to cause what's called a midline shift.  It's going to push that thing one way or the other.  Because the brain cannot expand outside the skull, so internally the pressure will push part of the brain away from the area where the pus pocket or the tumor or the aneurysm has ruptured or whatever is there.  And this is what you look for on a CT scan.

THE COURT:     Excuse me.  I misstated, Mr. Aultman.

MR. AULTMAN:  Yes, sir.

THE COURT:     Your objection as to pathology would be sustained.  But I do not view this as testimony that would necessarily be given by a pathologist.

MR. AULTMAN:  Okay, sir.

. . .

Q.     Is cerebral – what is cerebral swelling?

A.     That's an increased pressure inside the brain where the brain actually swells from an insult from whatever reason that's causing it.

Q.     Is that a response to, say, either the pus or tumor that's in there?

A.     Yes.

Q.     All right.  And then you've already said what a midline shift is.  Is a midline shift evidence of the response?

18

A.    Yes.

MR. AULTMAN:    To which we object, Your Honor.  Again,
this is an improper hypothetical.

THE COURT:    Overruled.

. . .

Q.    In general, as a family practice physician practicing family medicine for
18 years, should patients with brain absceeses or brain tumors that have
cerebral swelling and midline shifts, should they be admitted to
hospitals?

MR. AULTMAN:    Again, Your Honor, that's hypothetical
and not based on the facts, and we object
to it.

THE COURT:    Well, it's pretty broad and general.  I'll let
him answer that.

A.    Absolutely.

. . .

Q.    You stated earlier that you read the autopsy report, correct?

A.    That's correct.

Q.    How many cc of pus were found in Dustin's brain on autopsy?

A.    60 cc.

Q.    Would you tell the jury in relationship to the total amount of cerebral
spinal fluid is 60 cc of pus in relationship to that amount?

MR. AULTMAN:    Your Honor, again, this is outside his field
of expertise.

THE COURT:    Overruled.  I think it's probably common
medical knowledge.

19

A.   The total volume of cerebral spinal fluid, including the brain, the ventricules and the spinal cord, is approximately 140 cc in an adult patient. That's about four and two-thirds of an ounce; 60 cc is about two ounces. And if you add 60 cc, which is about approximately a half the total volume, you've increased intracranial pressure in the brain just from that insult being there.

        MR. AULTMAN:   Surely, he's not qualified to answer that. We object to that.

        THE COURT:   Overruled. I think that's common medical knowledge.

MR. PAULI CONTINUING:

Q.   So upon autopsy, a diagnosis of 60 cc of pus was found within Dustin's brain, correct?

A.   That's correct.

Q.   All right. And you said that that amount of pus, in relationship to the normal capacity, would result in swelling and edema; that correct?

A.   That's correct.

Q.   Does swelling and edema, within a reasonable medical probability, cause a midline shift in the brain?

A.   Yes, it would.

        MR. AULTMAN:   Again, we object, Your Honor.

        THE COURT:   Overruled.
. . .

Q.   . . . Dr. Gibson, as a family practice physician, if you suspected in your differential diagnosis that a brain infection may be the cause of your patient's headaches associated with nausea and vomiting, and that was confirmed on a CT scan, what would the CT scan reveal?

20

MR. AULTMAN: To which we would object to that, Your Honor, for reasons already stated.

THE COURT: Overruled.

A. The CT scan would show swelling and edema in the brain and a midline shift, if bad enough.

¶34. Many of these "facts" relied on by Dr. Gibson are simply not in the record. According to Dr. Hayne's autopsy report, on which Dr. Gibson relied, Dustin's cause of death was intraventricular abscess of the brain. In other words, the approximately sixty ccs of opaque yellow pus was identified in the autopsy report as being found within the ventricular system, not within the brain as Dr. Gibson alleges. To further support the pus being within the ventricular system and not the brain, Dr. Hayne's autopsy report went on to state "frank evidence of abscess formation is **not** appreciated to involve the cross-section segments of the brain. Acute inflammatory cell infiltrate appears to be confined to the ventricular system." (Emphasis supplied). Clearly, nothing in the autopsy record supports Dr. Gibson's bald opinion that a CT scan would have shown a midline shift in the brain. In addition, Dr. Lauridson, a board-certified forensic pathologist tendered by Dr. Bullock, testified:

Q. Tell the Court and the jury what a brain abscess has to do with this particular case?

A. It doesn't have anything to do with this particular case. A brain –

Q. Why is that, sir?

A. A brain abscess is different than the diagnosis here, which is ventriculitis. A brain abscess is a collection of inflammatory cells or pus within the substance of the brain, not within the ventricules (sic) themselves.

21

Dr. Lauridson went on to testify about the possibility of a midline shift appearing in a CT scan and stated:

> Q. You heard Dr. Gibson testify – I think it was either yesterday or day before yesterday about a midline shift. Did you hear that?
>
> A. I did, yes.
>
> Q. Would that occur in cases of ventriculitis?
>
> A. No. Ventriculitis – the ventricules (sic) on both sides are involved so that, although there is pressure building up and there is cerebral edema, the pressure is balanced so that a midline shift doesn't occur. And, in fact, in this case there was no midline shift described.
>
> Q. How do you know that?
>
> A. I reviewed the autopsy report.
>
> Q. And it shows what now?
>
> A. There was no midline shift described, which is something that a pathologist always notes when there – if it's there.
>
> Q. So all this talk about midline shift has what to do with this case?
>
> A. It doesn't have anything to do with ventriculitis.

When cross-examined by plaintiff's counsel on the addition of sixty ccs of pus, Dr. Lauridson stated:

> Q. Would you agree with me that, in the normal brain, an adult brain, you have 140 cc of pus, don't you?
>
> A. Yes. That's – that's – no, of cerebral spinal fluid. You said –
>
> Q. I'm sorry. 140 cc –
>
> A. Of cerebral spinal fluid.

Q. Right.

A. That's a very good estimate for it.

Q. I'm going to put CSF on here so I won't say it again. Thank you. Would you tell the jury whether the addition of approximately 60 cc of fluid takes up space, takes up volume, correct? When you start having substantially more than 140 cc of cerebral spinal fluid, do you have an opinion within a reasonable medical probability whether that would cause headaches?

A. You have a basic misunderstanding of the pathophysiology here. It's not an addition of 60 cc to the 140 cc. And the reason that we know that is that the ventricules, those spaces, at autopsy were not dilated. If that had been the cause of the cerebral edema, then those ventricules would have been dilated.

What happens is, the bacteria grows within that 140 cc of cerebral spinal fluid and forms pus in that volume. . . .

¶35. Since the standard of review on the issue of admissibility of evidence is abuse of discretion, we are compelled to find that the trial judge abused his discretion based on the above testimony. Dr. Gibson was qualified to testify as to the gold standard of care with regard to a family-practice physician, but Dr. Gibson exceeded the boundaries of his expert qualification when he testified to matters which were not based on sufficient facts or data. The trial court conducted a standard ***Daubert*** hearing and did not abuse its discretion in allowing Dr. Gibson to testify in this case; however, because we conclude that the trial judge did abuse his discretion in allowing Dr. Gibson to testify to facts not supported by the evidence, we find this issue to have merit. With this being said, while we conclude that the evidence was legally sufficient so as to withstand a motion for a judgment notwithstanding the verdict, since reasonable and fairminded jurors in the exercise of sound judgment could

23

have reached different conclusions, we on the other hand find that the verdict of the jury was against the overwhelming weight of the evidence. *Poole*, 908 So. 2d at 726-27. As we stated in *Poole*:

> Stated differently, we will not set aside a jury's verdict and order a new trial unless we are convinced that the verdict was contrary to the substantial weight of the evidence so that justice requires that a new trial be granted.

*Id.* at 727 (citing *Jesco, Inc. v. Whitehead*, 451 So. 2d 706, 713-14 (Miss. 1984) (Robertson, J., specially concurring)). When we consider the overall record in this case, especially in conjunction with Dr. Gibson's improper testimony basing opinions on purported facts which are unquestionably not found in the record, we must grant a new trial so as to not sanction an unconscionable injustice. A new trial can and must be granted if justice so requires. *Blossman Gas v. Shelter Mut. General Ins.*, 920 So. 2d 422, 424 (Miss. 2006) (citing *White v. Yellow Freight Sys. Inc.*, 905 So. 2d 506, 510 (Miss. 2004)).

¶36. Since we must reverse and remand this case for a new trial, we will address one more evidentiary issue to lend guidance to the trial court upon a retrial.

### III. LEARNED TREATISES EXCEPTION

¶37. We now turn to whether the trial court acted improperly by allowing the plaintiffs' counsel to cross-examine two defense witnesses, Dr. Bullock and Dr. Dennard, using an encyclopedia summary page printed from the University of Maryland Medical Center website on May 15, 2005, and a chapter from the textbook *Primary Care Medicine* by Nobles, respectively. The trial court allowed cross-examination by the plaintiffs' counsel using such articles based on the learned treatises hearsay exception. Miss. R. Evid. 803(18).

24

However, Dr. Bullock asserts that plaintiffs' counsel failed to properly authenticate said articles as reliable authorities as required under Rule 803(18); thus, the trial court abused its discretion by allowing the cross-examination with said articles.

¶38. Under Miss. R. Evid. 803(18), learned treatises are excepted from the hearsay rule.

> To the extent called to the attention of an expert witness upon cross-examination or relied upon by him in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice. If admitted, the statements may be read into evidence but may not be received as exhibits. Treatises used in direct examination must be disclosed to opposing party without charge pursuant to discovery.

Miss. R. Evid. 803(18). Thus, cross-examination of an expert witness with published medical articles is permitted only if such articles can be established as a reliable authority by (1) the testimony of the witness; (2) by other expert testimony; or (3) the court takes judicial notice. Miss. R. Evid. 803(18), *cmt*.

### A. Dr. Bullock

¶39. First, Dr. Bullock contends that plaintiffs' counsel failed to establish the encyclopedia summary from the University of Maryland website as a "learned treatise" under Rule 803(18). Specifically, Dr. Bullock classifies the encyclopedia summary as merely a summary of terms and definitions with absolutely no citation to other authorities, and no reference to author(s) or copyright date.

¶40. Second, Dr. Bullock contends that even if the encyclopedia summary qualified as a "learned treatise," the plaintiffs failed to established its reliability. When cross-examining

25

Dr. Bullock with the encyclopedia summary, the plaintiffs' counsel attempted to establish its reliability as follows:

> Q. Did you not just tell me that part of keeping your license and staying on top of medicine, that you are required to attend medical seminars to get continuing medical education? Is that part of the requirement to keep your license?
>
> A. You can get the hours from various things – seminars, meetings at the hospital, medical journals.
>
> Q. Medical journals.
>
> A. Uh - huh. (Affirmative Response)
>
> Q. So you customarily and routinely read medical journals that are published by various medical centers throughout the United States.
>
> A. Yes.
>
> Q. Okay. Would you consider an article published by the University of Maryland Medical Center to be routinely and customarily acceptable by your peers in the field of medicine, including family practice?
>
> MR. AULTMAN: To which we object, Your Honor.
>
> THE COURT: Overruled.
>
> A. I don't recall having read it. I couldn't tell you that it's a good – good source or not.

¶41. Immediately thereafter, the plaintiffs' counsel cross-examined Dr. Bullock with statements contained within the encyclopedia summary, to which defense counsel continued to object. Dr. Bullock contends that plaintiff's counsel did not establish the encyclopedia summary as reliable authority, the plaintiffs did not offer their own expert to establish the

26

encyclopedia summary as reliable authority, nor did the plaintiffs request the trial court to take judicial notice of the encyclopedia summary.

### B. Dr. Dennard

¶42. With regard to Dr. Dennard, Dr. Bullock's expert, the plaintiffs' counsel cross-examined him from a chapter in the textbook *Primary Care Medicine* by Nobles. Again, Dr. Bullock asserts that plaintiffs' counsel failed to establish the book as reliable authority by any of the three methods permitted by Rule 803(18).

¶43. Attempting to establish *Primary Care Medicine* by Nobles as reliable authority during cross-examination, the plaintiffs' counsel questioned Dr. Dennard as follows:

Q. Are you familiar with the textbook of *Primary Care Medicine* by Nobles, published by Mosby?

A. I don't recognize it by that name, but maybe I am. Do you have it with you?

Q. No. I have an article from it. Let me just walk over here and show it to you and see if you recognize – the textbook is *Primary Care Medicine*, Third Edition, published by Mosby – M-O-S-B-Y. The text is attributed or that chapter is attributed to Nobles. Do you recognize Mosby, the publisher of –

A. Yes, I do. Yeah. I don't know that – I'm not sure I know that – familiar with that text, but –

Q. But you're familiar with the publishing company and that they are recognized in publishing medical textbooks, aren't you?

A. That's correct.

¶44.    Based on the above testimony from Dr. Bullock and Dr. Dennard failing to recognize the articles were reliable authorities, Dr. Bullock cites *U.S. v. Norman*, 415 F.3d 466 (5th Cir. 2005) and *Dawsey v. Olin Corp*., 782 F.2d 1254 (5th Cir. 1986) to illustrate how the trial court erred by allowing the continued cross-examination using said articles.  In *Norman*, the Fifth Circuit upheld the lower court's ruling which denied a criminal defendant the opportunity to cross-examine Drug Enforcement Agents using a Justice Department manual on eyewitness identification.  *Id*. at 473.  The Fifth Circuit Court of Appeals stated, "[t]he treatise was not established as a reliable authority because Norman did not offer an expert in this area, the testifying agents did not recognize the manual, and the court did not take judicial notice of its reliability."  *Id*.

¶45.    Similarly, in *Dawsey*, the Fifth Circuit affirmed the lower court's ruling denying the plaintiffs the right to cross-examine an expert with the National Institute of Occupational Health and Safety ("NIOSH") manual because the plaintiffs failed to establish the manual as reliable authority.  *Id*. at 1263.  The Fifth Circuit Court of Appeals stated, "[neither] Dr. Comstock nor any other witness testified that the NIOSH manual was a reliable authority; therefore, the trial court correctly prohibited plaintiffs from using statements contained in the manual to cross-examine Dr. Comstock [defendant's expert]."  *Id*. at 1264.

¶46.    Because the encyclopedia summary and textbook were not established as reliable authorities by either Dr. Bullock or Dr. Dennard, the plaintiffs did not offer an expert to establish either article's authority, and the trial court did not take judicial notice of either article's authority, plaintiffs' counsel should have been prohibited from using the articles

28

during cross-examination of expert witnesses. In fact, Dr. Bullock's numerous objections should have been sustained by the trial judge.

## IV. REMAINING ISSUES

¶47. Because of our disposition of this case, we deem it unnecessary to address the remaining issues raised by Dr. Bullock in today's case.

## CONCLUSION

¶48. For the reasons above, we reverse the trial court judgment entered in favor of W. L. Lott and Laura Lott, individually, and on behalf of the wrongful death beneficiaries, as parents of Dustin Lott, a deceased minor, and against Ronald A. Bullock, M.D., and we remand this case to the Circuit Court of Covington County for a new trial to be conducted consistent with this opinion

¶49. **REVERSED AND REMANDED.**

**SMITH, C.J., WALLER, P.J., EASLEY, DICKINSON, RANDOLPH AND LAMAR, JJ., CONCUR. GRAVES, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY DIAZ, P.J.**

**GRAVES, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶50. I agree with the majority that the trial court properly denied the motion for change of venue. However, I disagree with the majority on the remaining issues. The trial court properly allowed the testimony of Dr. Gibson, and the failure to require establishment of the reliability of the medical articles was harmless error. Because I would affirm the trial court, I respectfully dissent in part and concur in part.

29

¶51. The majority concedes that Dr. Gibson clearly met the ***Daubert*** qualifications to testify in the fields tendered, but then found that portions of his testimony were not based on sufficient facts or data. Specifically, the majority found that Dr. Gibson offered opinions based on facts not in evidence. I disagree because the majority's findings are not supported by the record in this matter.

¶52. The majority finds that "[m]any of these 'facts' relied on by Dr. Gibson are simply not in the record." Specifically, the majority states that pus was found "within the ventricular system, not within the brain as Dr. Gibson alleges." However, based on testimony from Bullock's experts at trial and other evidence, the ventricular system is clearly within the brain. Dr. James Lauridson, expert in the field of forensic pathology, said, "the ventricles are cavities that are deep in the brain." Further, he said, "that ventricle is a smooth lined cavity that's right in the center of the brain. . . ." With reference to a brain abscess, Dr. Lauridson said, "[i]t can be anywhere in the substance of the brain, but it is not strictly in the ventricle." Dr. John Lancon, the defense expert in the field of pediatric neurosurgery, identified the ventricles as "being the normal fluid filled spaces within the brain."

¶53. The majority cites Dr. Steven Hayne's autopsy report to support the proposition that pus was found in the ventricular system and not the brain. The majority then quotes a portion of Dr. Hayne's report for this proposition. However, the language quoted, where Dr. Hayne says brain "abscess formation is not appreciated" but that there was inflammation in the ventricular system, clearly fails to rule out the possibility of any pus in the brain. Further, Dr. Hayne's report stated the following: "The brain is serially cross-sectioned and

30

approximately 60 cc of opaque yellow pus is identified within the ventricular system." This statement is further indication that the ventricular system is located within the brain and that pus was present. Additionally, Dr. Edwin Dennard, the defense expert in the field of family practice, offered testimony to dispute the majority's finding. During cross-examination of Dr. Dennard, the following exchange occurred:

> Q.    Let me ask you this. Do you agree with me that microorganisms got into his brain and started developing pus in his brain?
>
> A.    That's what appears happened. And pus is verily bacteria.

¶54.    The majority takes issue with Dr. Gibson's statements regarding whether a CT scan would show a midline shift. Dr. Gibson's actual testimony was as follows: "When you order a CT scan of the head, it depends on what you're looking for, what you suspect. In this case of an abscess, you would be looking for a shift in what we call the midline."

¶55.    In the autopsy report, Dr. Hayne stated:

> The decedent was noted to succumb secondary to an intraventricular abscess without significant meningeal involvement on the external surfaces of the brain. Approximately 60 cc of purulent material is identified within the luminal space of the ventricular system of the brain and a focal gliosis is identified on the adjacent sides of the central nervous system avoiding the ventricular canals. The etiology of the ventricular abscess is thought to be related to the noted sinusitis identified to involve the frontal sinuses.

The medical examiner's death report reiterates this finding.

¶56.    There is clearly sufficient evidence of the existence of an abscess. Hence, there is support for Dr. Gibson's opinion. Gibson's testimony was consistent with the testimony of the other experts and with other evidence in the record. The defense experts disputed that

there was an abscess. However, the testimony of the defense experts in no way invalidated the testimony of Dr. Gibson, which was consistent with facts in the record. As a result, Dr. Gibson's testimony was within his area of expertise and based on sufficient facts and data.

¶57.    Moreover, even if Dr. Gibson testified with regard to any hypothetical situations or facts not in evidence, such testimony would not be improper. In ***Daubert v. Merrell Dow Pharmaceuticals, Inc.***, 509 U.S. 579, 113 S.Ct. 2786, 125 L. Ed. 2d 469 (1993), the United States Supreme Court said:

> That these requirements are embodied in *Rule 702* is not surprising. Unlike an ordinary witness, see Rule 701, an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation. . . . Presumably, this relaxation of the usual requirement of firsthand knowledge – a rule which represents "a 'most pervasive manifestation' of the common law insistence upon 'the most reliable sources of information,'" . . . – is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline.

***Daubert***, 509 U.S. at 592.

¶58.    This Court has held similarly in various cases. *See* ***Hull v. State***, 687 So. 2d 708 (Miss. 1996) ("Rule 703 allows an expert to base his opinion on the opinions of others which are not in evidence so long as experts in the field ordinarily rely on such opinions in forming their own opinions."). *See also* ***Miss. Transportation Comm'n v. McLemore***, 863 So. 2d 31, 37-38 (Miss. 2003) ("When stating opinions, an expert is given greater latitude than a lay witness under the assumption that an expert's opinion is reliably based on knowledge and experience particular to a chosen discipline."); and ***West v. Sanders Clinic for Women, P.A.***, 661 So. 2d 714 (Miss. 1995) ("We find no merit, however, in the contention that parts of

32

Taylor's deposition was [sic] speculative because he testified in language couched in terms of possibilities, and not probabilities. This Court does not require magical language in an expert's answers, as long as the import of the testimony is apparent.").

¶59. In the third issue, the majority finds that the Lotts failed to establish the encyclopedia summary and textbook as reliable authority before using them during cross-examination of expert testimony.

¶60. Counsel attempted to establish the reliability of the material during cross-examination of Dr. Bullock, but, as quoted by the majority, defense counsel objected. However, the majority fails to include defense counsel's second objection immediately thereafter which included the actual reason for the objection. Specifically, Bullock's counsel said: "Your Honor, again, he's reading from something on brain abscess. And what the doctor testified to was the deceased had spontaneous ventriculitis. Now, if that pertains to ventriculitis, we have no problem with it." Bullock's counsel failed to properly object. Thereafter, the material was used to cross-examine Dr. Bullock.

¶61. Later in the trial, Bullock's counsel raised a hearsay objection during the cross-examination of Dr. Dennard. However, the trial court found that a showing of reliability was not necessary when the material was merely being used to ask questions. While it may have been error not to establish the reliability in accordance with the rules of evidence, it was harmless error in light of the very limited use of the materials and the fact that a substantial right was not affected. *See Carroll v. Morgan*, 17 F.3d 787, 790 (5th Cir. 1994). *See also* Miss. R. Civ. P. 61.

33

¶62. For the reasons stated herein, I would find that the trial court properly allowed the testimony of Dr. Gibson and that the failure to require establishment of the reliability of the medical articles was harmless error. Because I would affirm the trial court on all issues, I respectfully dissent in part and concur in part.

**DIAZ, P.J., JOINS THIS OPINION.**