RANDOLPH, Presiding Justice,
concurring in part and dissenting in part:

Liability

¶ 117. I agree with my fellow justices’ unanimous concurrence that the jury was presented ample evidence to impose liability on the defendants. The record reveals sufficient evidence was presented that the defendants: (1) breached their duties to disclose material facts; (2) tortiously interfered with Evans’s contracts and/or business advantages; (8) breached fiduciary duties of candor and disclosure; and (4) breached duties of good faith and fair dealing, inter alia, to Evans, Evans’s various companies, and Laredo.
¶ 118. The defendants acknowledged limited representation of Evans Operating Co., Inc., in oil and gas board proceedings in 2001 and 2005-06, but disclaimed all other representation. The defendants did so despite that its attorney Jon Carroll performed work “relat[ed] to the transfer of Rig 12[and] prepare[d] loan documents reflecting such transfer”; prepared agreements for other Evans companies; prepared and revised documents for Evans and his wife for the Draw Works Loan (Rig 11 mortgage); provided advice in forming other companies controlled by Evans (or companies in which Evans was the sole member of an LLC); despite that defendant Held performed legal services for both Evans and Laredo; and despite legal representation and services rendered by other Baker & McKenzie attorneys for both.
¶ 119. The defense sought to shift responsibility to Evans by characterizing him as keeping his businesses afloat through overdrafts, unpaid checks, and tax evasion, inter alia. The defense painted Evans with a broad brush as a heavy drinker, gambler, and unsuccessful businessman who made bad deals with their preferred client, Cagle, and then blamed them for the losses.
¶ 120. The jury was furnished considerable documentary evidence, apart from Evans’s testimony, to contest that presented by the defense. Given the conflict in evidence, it was for a jury to decide wheth *418 er letters authored by Evans and received by Baker & McKenzie specifically referencing Rig 12 and clearly stating that he would not mortgage his rig, did not mean Rig 12, but, rather Rig 11, as testified to by Held. It was for the jury to decide if Held’s receipt of a gift from Cagle—a Mercedes SL 500—clouded his decisions and caused him to breach his fiduciary duties and separate duties of good faith and fair dealing owed to Plaintiffs and Cross-Plaintiffs. It was for a jury to decide whether Baker & McKenzie’s attorney, Laura O’Rourke (who did not appear at trial), made a mistake when she sent a letter to the Mississippi Secretary of State in January 2006, wherein she stated, “[tjhis law firm represents S. Lavon Evans, Jr., S. Lavon Evans, Jr. Operating Co., and S. Lavon Evans, Jr., Inc. (“Lavon Evans”).” It was for the jury to determine whether Baker & McKenzie attorney Jon Carroll (who also did not appear at trial), after receiving a copy of Evans’s second written instruction not to mortgage Rig 12, concealed from Evans that Carroll and others at Baker & McKenzie were reviewing and “revising] [the] guaranty, security agreement and promissory note” for Rig 12, engaging in “multiple telephone conferences with Reed Cagle regarding status,” “analyzing] the enforceability of grant of security interest by non-borrower [Evans] [,] ” and “analyzing] applicable state law for security interest” on the very same day, February 22, 2006; and assisted Cagle in mortgaging Rig 12 without Evans’s written consent (although Baker & McKenzie prepared a consent form which it never presented to Evans). It was also for the jury to decide whether, after Carroll directed the formation of corporate entities involving Evans, Carroll told Evans that the Draw Works Loan (which Baker & McKenzie assisted Evans in entering at the behest and instruction of Cagle) was conditioned upon Evans signing the operating agreement in August 2006[42] (effective March 2006, two days before Cagle mortgaged Rig 12);failed to disclose to Evans that his signature would ratify the mortgage Evans never wanted on his rig;[43] and, subsequently, when Carroll changed the members of the LLC he formed for Evans absent Evans’s knowledge and without Evans’s permission or written consent.
¶ 121. Evans claimed the defendants’ actions culminated with Baker & McKenzie suing Evans on behalf of Cagle in state and federal courts in Texas. In those suits, Baker & McKenzie represented Ca-gle and Reed Petroleum (a company owned by Cagle and the minority shareholder in Laredo). As noted by the majority, in one suit, Baker pleaded that E & D was a member of Laredo (which it was not), that Reed Petroleum was the controlling member of Laredo (which it was not), and that Laredo did not have a signed operating agreement (which it did). See Maj. Op. ¶ 43. In the federal district court case, the judge appropriately described the events as “involving] posses of oil companies, tales of clandestine overnight bank runs across three states, beefs over debts owed, and fierce (and figurative) battles *419 between hired guns — known in these parts as attorneys.”
¶ 122. In May 2007, Baker & McKenzie attorney Elizabeth Yingling filed suit and obtained a temporary restraining order against Evans related to Rig 12. In the proceedings, Yingling represented that Ca-gle (Heartland) was the majority owner of Laredo (which it was not) and that no operating agreement had been executed by Cagle, Evans, or their respective entities (although it had). She testified in the case sub judice that this representation was a “good faith mistake.” Yingling also testified that she had never seen the letter sent by O’Rourke which claimed representation of Evans. Yingling further testified that she had made a “good faith investigation” and had talked to the client, Laredo, on several occasions. However, she admitted that she had never spoken to Evans — the majority owner/member of Laredo. It was for the jury to decide whether Yin-gling made a series of good-faith mistakes, before she sued one Baker & McKenzie client on behalf of another, made untrue representations, and breached duties identified in ¶ 117 supra. Only after Evans filed a motion to disqualify Baker & McKenzie did the firm withdraw their representation of Cagle and his related companies.
¶ 123. Evans testified that he owned equipment and eleven drilling rigs free and clear of debt, two later identified as Rigs 11 and 12. Evans told Baker & McKenzie (orally and in writing) that his rigs were not to be mortgaged. He further told Baker & McKenzie that he was to be fifty-one-percent owner for all entities which they might form for himself and Cagle, and that he would hold a controlling interest. Before the debacle was over, Rigs 11 and 12 were mortgaged and lost, and Evans had millions in personal liabilities.

Evans Plaintiffs’ Damages

¶ 124. The plaintiffs’ evidence regarding damages is conflicted as between Evans’s oral testimony and documentary evidence, thus, the jury was not presented damages evidence with a “reasonable certainty.” See Flight Line, Inc. v. Tanksley, 608 So.2d 1149, 1164 (Miss.1992). Evans testified that he was worth $50 million before these events, and, by the time of trial, had a negative net worth of $81 million.
¶ 125. The defendant’s expert countered Evans’s net-worth assessment, opining that his net worth was substantially less, only $13 to $14 million. However, Evans presented financial statements which revealed a net worth of approximately $35 million in 2006 (at the beginning of the fiasco) and a negative net worth of approximately $31 million by 2010. The 2006 financial statement revealed approximately $30 million of his net worth included ownership of other Plaintiff companies. The 2010 financial statement revealed in excess of $25 million in liabilities, plus an additional $6.6 million in liabilities for which Evans was personally liable or jointly liable with his companies. The substantial difference between Evans’s oral testimony and documentary evidence is what warrants a new trial on damages, as both cannot be reasonably certain.

Laredo

¶ 126. With all due deference, the defendants were not entitled to jury instructions relied upon by the majority to reverse Laredo’s award, based on the absence of facts to support such instructions. Before summarizing the pertinent substantive/theory instructions given at the behest of the parties, we first examine the trial court’s instructions and related principles. No one instruction should be viewed in isolation. The jury was instructed that it must exercise its vested *420 authority in accordance with the rules of law as stated by the court. The jury was instructed that it had a duty to determine facts from the evidence produced at trial and apply the law as stated to those facts. The jury was reminded that it would be a violation of its duty to base its verdict upon a view of the law other than that provided in the instructions.
¶ 127. Parties are entitled to a limited number of “instructions on the substantive law of the case,” which the trial court imposed on the parties. Miss. R. Civ. P. 51; URCCC 3.07. Such instructions should set forth legally defined duties for the jury to apply to the facts presented to determine if a breach of that duty occurred, vel non. In this case, both parties were granted instructions outlining their theories of the case. For example, P-ld set forth the elements required to prove the plaintiffs civil conspiracy claim — a claim involving unlawful, overt, nonnegli-gent acts to which apportionment of fault would not apply. See Miss.Code Ann. § 85-5-7(1) (Rev.2011) (“‘Fault’ shall not include any tort which results from an act or omission committed with a specific wrongful intent.”) P-2a set forth the necessary elements to prove willful intent to conceal material facts or omission of fact, inter alia. The defense offered D-4a to counter the P-2a instruction. P-Ba instructed the jury on intentional and willful interference with contract, another claim not involving “fault” and not subject to apportionment. The defendants countered that instruction with D-3c. P-4a instructed the jury on legally defined duties regarding fiduciary claims, including honesty, good faith, fairness, integrity, fidelity, confidentiality, candor and disclosure, inter alia. P-5a instructed the jury on the duties of good faith and fair dealing. The defendants countered these instructions with D-5 which set forth elements required before the jury could find the defendants liable, i.e., that the defendants “breached the contract by some conduct that violates the standards of decency, fairness or reasonableness.”[44] These instructions exemplify proper instructions on defined legal duties, which are required to guide a jury on the applicable law to the facts presented.
¶ 128. We now turn to the instructions at issue for comparison to the aforementioned exemplars. The defendants complain that they were denied instruction D-9a, which would have allowed the jury to apportion “fault” to Cagle.[45] Apportionment of fault is an affirmative defense. To obtain a jury instruction on that defense, a defendant must adduce evidence to support its application. ‘“[Fjault’ means an act or omission of a person which is a proximate cause of injury or death to another person or persons, damages to property, tangible or intangible, or economic injury, including, but not limited to, negligence, malpractice, strict liability, absolute liability or failure to warn.” Miss.Code Ann. § 85-5-7 (Rev.2011). To establish Ca-gle’s fault, the defendants were required to set forth: (1) a legally defined duty that Cagle owed to Laredo; (2) that Cagle breached that duty; and (3) that Cagle’s breach proximately contributed to Laredo’s damages. Before a jury could find that Cagle was at fault, i.e., negligent, the jury necessarily should have received a *421 separate instruction(s) on a legally defined duty or duties and what act(s) or omission(s) caused a negligent breach of that duty, assuming arguendo that evidence was adduced in support thereof. D-9a and all other instructions are devoid of either.
11129. The defendants assert in their brief that “the evidence overwhelmingly supports an allocation of fault to Cagle,” and that Cagle was “referenced 779 times during the trial,” based on the defendants’ word search of the electronic trial transcript. I have scoured the record high and low, first using my preferred method (which some may describe as archaic) of meticulously reviewing the paper transcripts of the testimony presented to the jury. Given the size of the verdict, I felt compelled to review the testimony anew, to see if I had overlooked evidence supporting apportionment of fault to Cagle. Employing the same electronic disk as the defendants, I searched and reviewed all references to Cagle therein and the surrounding testimony. Just as with my time-tested and true methodology (albeit considerably more painstaking), I found not a scintilla of evidence that any witness charged, alleged, averred or claimed that Cagle acted or omitted to act negligently.[46] The only acts gleaned from the testimony presented was that Cagle specifically and wrongfully intended to mortgage property he did not own.
¶ 130. Simply put, D-9a asked the jury to assign some unknown and undefined fault to Cagle without any additional instruction as to the breach of a legally defined duty to direct it. D-9a lacked the prerequisite defined legal duty and it failed to direct the jury to “as defined by other instructions” — perhaps for good reason. No other instruction set forth a legally defined duty that Cagle may have breached — again, perhaps for good reason. No evidence was adduced to support such an instruction, and no evidence has been identified by the majority opinion. Thus, the jury heard no facts nor was an appropriate instruction requested by the defendants to apportion fault to Cagle as required by Mississippi Code Section 85-5-7. [47]
¶ 131. Assignment of fault in the abstract should not be condoned or approved by any court. Such vacuous and vague concepts cast a jury afloat at sea without a compass, leaving it to its own unbridled volition and imagination as to what “fault or other conduct,” vel non, was appropriate to consider. See Freeze v. Taylor, 257 So.2d 509, 513 (Miss.1972) (“[The instruction] permits the jury to roam at large in search of any negligence they may imagine whether based upon statutory duty or some fanciful care and caution not authorized by law.”) Albeit for the wrong reason (sequence of the instruction), D-9a should have been denied nonetheless. See Dunn v. Yager, 58 So.3d 1171, 1190 (Miss.2011) (quoting Green v. Cleary Water, Sewer & Fire Dist., 17 So.3d 559, 572 (Miss.2009)) (citations omitted) (“[i]t is well established in our jurisprudence that the right result reached for the wrong reason will not be disturbed on appeal”).
¶ 132. The majority finds error with D-CP4. The defendants objected to D-CP 4 *422 at trial but did not raise that issue on appeal. Error should not be predicated on a claim not properly before the Court. See Glover v. Jackson State University, 755 So.2d 395, 398 n. 1 (Miss.2000) (“[T]his Court has long held that issues not raised on appeal are procedurally barred from consideration.”) Moreover, any claim of error in granting D-CP 4 was mooted by the jury’s decision. Evans’s claim against Laredo was rejected; thus, indemnification is not an issue before this Court.
¶ 133. The defendant objected to D-CP 5 as peremptory. Although inartfully drafted, the instruction was not peremptory. It did not direct the jury to reach only one conclusion. The question of liability on each of Laredo’s causes of action, with the pertinent legally defined duties and elements, was properly submitted to the jury through other instructions. The jury was clearly instructed that it must find legal fault before it could award damages. Thus, when read in conjunction with all the instructions, D-CP 5 was not peremptory and did not constitute reversible error. See Franklin Corp. v. Tedford, 18 So.3d 215, 240 (Miss.2009) (citing Lamar Hardwood Co. v. Case, 143 Miss. 277, 107 So. 868 (1926)) (“The law requires all instructions to be read together.”),
ii. Laredo’s award
¶ 134. Since liability was clearly established and the jury was not erroneously instructed, the Court is left to determine only whether proper and sufficient evidence supported the verdict amount. See Southwest Mississippi Reg’l Med. Ctr. v. Lawrence, 684 So.2d 1257, 1267 (Miss.1996) (citing Adams v. Green, 474 So.2d 577, 581 (Miss.1985)) (“This Court will not set aside a jury verdict unless it is against the overwhelming weight of the evidence and credible testimony.”). Laredo’s jury award is supported by credible evidence and cannot fairly be characterized as the product of jury confusion or “excessive as to evince bias, passion or prejudice.” See Missala Marine Services, Inc. v. Odom, 861 So.2d 290, 295 (Miss.2003). At trial, sufficient credible evidence was presented that valued Laredo’s damages at $22.4 million. Even the defendant’s expert conceded that he did not contest the $22 million appraisal of Rig 12 made just three months before it was seized. Nor did the defendants contest Koerber’s testimony that Laredo had incurred approximately $400,000 in attorney’s fees — perhaps for good reason. The record reveals that in May 2007 Held was charging $650 per hour, Yingling $400 per hour, and Carroll $345 per hour. Baker & McKenzie’s monthly billing to Cagle for May 2007 totaled $157,797.81. In March 2006 (when Rig 12 was mortgaged), Baker & McKenzie billed Cagle $18,603.44 Re: S. Lavon Evans Operating Co. (client matter number 3) and $57,438.39 for client matter number 1 — a total of $76,041.83. Based upon the evidence presented as to Laredo’s damages, the jury’s verdict of $22.4 million was responsive to the evidence presented. As Laredo’s verdict comports with the evidence presented, there is no factual or legal basis for this Court to nullify or disturb that verdict. See id.
¶ 135. The majority’s concerns over confusion which lead to Evans’s verdict(s) simply do not exist with Laredo’s verdict. Furthermore, the majority should not be concerned with a duplicative award. As Evans’s case will be retried on damages, he would not be entitled to a share of Laredo’s loss, assuming Laredo’s verdict had been affirmed. See Medlin v. Hazlehurst Emergency Physicians, 889 So.2d 496, 501 (Miss.2005) (holding that a plaintiff may recover only once for his damages).
¶ 136. In conclusion, I join in reversing the Evans plaintiffs judgments for a new *423 trial on damages only. As to Laredo, I would affirm the jury’s verdict and trial court’s judgment. The jury has spoken, and no legal or factual basis exists for this Court to overturn their decision. I would also affirm Laredo’s attorneys fees award of $2,735,932.50 and $75,000 in punitive damages.
KITCHENS, CHANDLER AND KING, JJ., JOIN THIS OPINION.

. The record reveals that, in August 2006, Baker & McKenzie billed Cagle, RE: S. La-von Evans Jr. Operating Co., for $7, 954.00. In that month, Carroll conducted multiple telephone conferences with Reed Cagle and others "regarding loan for ... Evans[,]” "prepare[d] promissory note, security agreement and guaranty” for the loan, and "attend[ed] to Evans loan closing matters[,]” inter alia. The record also reveals that this bill was paid by E & D Services, a company wholly owned by Evans.

. The Texas state court later ruled Evans ratified the mortgage that Baker & McKenzie had prepared for Cagle on Rig 12.

. "Fault” may be apportioned in claims against "tortfeasors,” not contract claims.

. The instruction also allowed the jury to apportion "fault” to Laredo ("acting through ... Evans or others”). The instruction further allowed the jury to apportion fault to "some other [unknown and unidentified] participant in the events.” However, on appeal, the defendants have only argued that the trial court erred in denying instructions that would have allowed apportionment to Cagle.

. At the jury charge conference, counsel for Laredo argued (in response to D-9a) that “the fault of Reed Cagle has not been plead..[or] put in evidence through any witness.... [Baker & McKenzie] did not argue it in their opening statement.” Counsel further argued, "[o]ur claim against Baker McKenzie is one of malpractice and breach of fiduciary duty and things particularly related to services of a law firm to its clients. Mr. Cagle is not a lawyer. His duties are entirely different.”

. The same analysis applies to instruction D-8a, as it suffers from the same shortcomings as D-9a.